No. 82-03

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

_____

IN RE THE MARRIAGE OF

EARL MYERS,

Petitioner and Appellant,

and

DONNA MYERS,

Respondent and Respondent.

_____

APPEAL FROM:  District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Jack D. Shanstrom, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Holmstrom & Dunaway; Robert Holmstrom, Billings,
Montana

For Respondent:

Robert L. Stephens, Jr., Billings, Montana

_____

Submitted on Briefs:  January 19, 1984

Decided:  May 29, 1984

Filed:    MAY 29 1984

_Ethel M. Harrison_
_____
Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

Petitioner husband, Earl T. Myers, appeals from a Yellowstone County District Court judgment awarding approximately one-sixth of the marital property to him, and approximately five-sixths of the marital property to the respondent wife, Donna F. Myers. The husband contends that because the trial court refused to divide the marital property on a 50/50 basis pursuant to an agreement executed between the parties on September 2, 1976, the trial court abused its discretion. We affirm.

The sole issue is whether the trial court abused its discretion when it refused to divide the marital property according to the September 2, 1976 agreement and awarded approximately five-sixths to the wife and one-sixth to the husband.

At the time the parties were married on April 14, 1972, the husband was 47 and the wife 42. He had been married and divorced four times and she had been married and divorced twice. The trial court found that at the time of their marriage, the wife had a net worth of approximately $176,000, and he had a net worth of approximately $22,000. Following their marriage, the parties lived in a residence owned by the wife's father, located on Mariposa Drive in Billings, where the wife had been living prior to their marriage. The husband did some renovation work on this house, including redoing the showers and laying some carpet. The parties paid no rent to the wife's father.

A majority of the wife's assets at the time of the marriage consisted of her one-quarter interest in a family

partnership that owned several commercial buildings known as the Moran Property. The property included the Billings Pioneer Post Office and parking lot; the Laurel Post Office; the J. C. Penney building in Laurel; the McCleod Building in Billings; the Montana Power Complex (three buildings); and, a building referred to as the "Shell Shack." The wife's father, John H. Moran, had acquired the property over the years, and expressed many times his desire to keep the property in the family.

Four or five months after the marriage, the parties separated. The wife remained living in the house on Mariposa, and he moved into an apartment somewhere in Billings. Sometime later, the wife's mother, Pearl M. Moran, approached the husband to see if he would be interested in buying some of the Moran property with his wife. The offer was made to attempt to persuade the husband to reconcile with his wife. The husband stated that he would be interested only if he would be brought in as an equal partner with his wife.

The plan was for the parties to purchase the Billings Pioneer Post Office and parking lot, the J. C. Penney building in Laurel, and the Laurel Post Office. To effectuate the equal ownership, she gifted one-half of her one-quarter interest in that property to her husband. The partnership was then dissolved, and the above property was conveyed to the parties at a total purchase price of $255,000, though the appraised value of the property was $340,000.

As a downpayment of $7,500, the wife conveyed to the other partners (her parents and brother) her one-quarter interest in the Montana Power Building in Laurel. The

parties then executed a mortgage on the balance of $247,500, payable in monthly installments of approximately $2,100. The mortgage payments were made from rental income received from the properties. At the time of trial, a balance of $108,155.74 remained on the purchase price. It is important to note that the husband made no financial contribution toward the purchase of the Moran property. He did, however, help to manage and maintain the property for a few years.

The parties established the Big-M Company and transacted business as a partnership. In addition to the Moran real property, the parties also acquired a small tractor with attachments, two older model pickup trucks and a dump truck, and tools and equipment. The total value of this Big-M Company personal property was $9,100.

In April 1973, after the Moran family partnership had been dissolved, and after the husband had been brought in as a 50/50 partner on some of the Moran property, the parties purchased the residence on Mariposa in Billings. The husband paid $15,000 of his funds for a one-half interest in the house, though the original cost basis of the house was $32,000 and had appreciated in value since being built. The other one-half was gifted to the parties by the wife's father. The parties sold the residence the next year for $50,000, realizing a handsome gain.

The parties had earlier arranged to purchase a tract of real estate on the Rimrock area overlooking the City of Billings, and had mortgaged the Mariposa residence to pay for the land. When the Mariposa residence was later sold, the mortgage obligation was retired. The parties began construction of a home on that property, both parties contributing time and effort, but with the husband providing

most of the carpentry and labor skills. The husband stopped working on the home when further marital problems arose, and the house was unfinished at the time of trial.

At the time of their marriage, the husband owned a tract of land on the North Frontage Road near Billings. The husband sold the property, realized the sum of $12,500 and used the money to make the $11,600 downpayment on the Scott Building in Laurel on April 1, 1976. The husband also used his funds to make the first of four $8,574.83 installment payments. The Scott Building was adjacent to the J. C. Penney building, and after the purchase, J. C. Penney expanded into the smaller Scott Building. The final three installments on the Scott Building were paid for completely out of rental income from the existing leases on real estate purchased from the wife's family.

The parties were separated at the time the Scott Building was purchased in April 1976, and were still separated in August of that year. During this time, the wife had been attempting to encourage the husband to reconcile. But, the husband refused to reconcile unless the wife agreed to put into writing his one-half interest in all the property, including the Moran property. The resulting agreement of September 2, 1976, is the focus of this dispute because the trial court refused to divide the property according to its terms--i.e., 50/50.

The pertinent provisions of the agreement state as follows:

"NOW, THEREFORE, each party agrees as follows:

"1. That each of the parties hereto own an undivided one half interest in real property described on Schedule 'A' (all their real property) attached hereto, and any real estate acquired

subsequent to the date hereof shall be held as tenants in common.

". . .

"3. In the event of a divorce of the parties, the title to the real estate which is the subject of this Agreement, may either:

"A. Remain as it presently is;

"B. Be divided pursuant to agreement between the parties;

"C. Be sold and the proceeds therefrom divided equally between the parties hereto . . ."

After the parties executed the agreement, they reconciled and lived together for a short while. Seven months after the agreement was executed, and five years into the marriage, the husband filed for divorce. The divorce decree was entered November 16, 1977.

The trial court awarded to the wife real property having an appraised value of $735,000, subject to a mortgage of $108,155.74. She was also awarded her separate vehicle and all of her home furnishings. The trial court awarded to the husband no real property, the Big-M personal property consisting of the three trucks, the tractor, tools and equipment ($9,100), and $95,000 in cash.

Neither party made any steadfast contention at the trial as to what exactly the September 2, 1976 agreement represents. The husband contends on appeal that because the agreement was executed during a period of reconciliation, it cannot be a separation agreement under section 40-4-201, MCA, and is therefore a postnuptial agreement under sections 40-2-301 through -311, MCA. He contends in the alternative that if it was a separation agreement, it was binding on the trial court because the court failed to find it "unconscionable," as required by the statute. The wife

- 6 -

contends that it was a separation agreement because they were separated at the time it was executed, and in fact the husband would not reconcile unless she signed the agreement. She also argues that the court's finding of fact no. XVI was sufficient for purposes of finding 'unconscionability' under section 40-4-201. The trial court's finding no. XVI provides:

> "The history of the parties' marriage is a brief but stormy one, punctuated by numerous separations and attempted reconciliations. During the course of one such reconciliation, the parties entered into an agreement dated September 2, 1976, which purported to acknowledge equal half interests in all of the parties' property and which was ostensibly designed to clarify the parties' respective rights. The parties had previously discussed other similar agreements which were not executed. In each case the agreements were created in an atmosphere of emotional turmoil, the Petitioner acting as instigator, and the Respondent seeking to preserve the marriage. While the Court is required to consider such an agreement, it is in no way binding and the Court finds that under all of the circumstances the enforcement of such an agreement would be inequitable in this case." (Emphasis added.)

We believe the trial court properly refused to divide the property according to the agreement. We also believe that the result would be the same whether the agreement was a separation agreement or a postnuptial agreement.

Section 40-2-301, MCA, relied on by the husband, specifically states that contracts between spouses are subject to the general rules "which control the actions of persons occupying confidental relations with each other. . .," as defined in the trust provisions. The husband's actions were far from complying with those rules. In the fall of 1972, four months after their marriage, the parties were already separated. The wife wished to reconcile with her husband so she asked her mother to offer him a

chance to join the wife in buying some of her parents' property. He refused to reconcile unless he was made a 50/50 partner in ownership. Because she wanted to reconcile the marriage, the wife agreed, and that is when her family's partnership was dissolved and the Big-M Company formed. But, the husband made absolutely no financial contribution toward the purchase of the Moran property.

The husband then made several efforts to ink his one-half interest in the property. Admitted over the husband's objections at trial were three separate property agreements, all drafted at the instigation of the husband, and all designed to make sure he received one-half of his wife's property. The first two were never executed and the last one was the September 2, 1976 agreement.

The fact that makes the husband's attempt to secure one-half of her property most contrary to a trust relationship is that he was doing so during a short-lived and rocky marriage. The trial court found that "in each case the agreements were created in an atmosphere of emotional turmoil, the (husband) acting as the instigator, and the (wife) seeking to preserve the marriage." Indeed, there was testimony that the parties were separated more than they were together during their stormy five year union. Furthermore, it did not take the husband long (seven months) to file for divorce after he succeeded in having his wife sign the September 2, 1976 agreement.

We believe the evidence shows that the husband took advantage of his wife regarding her property as a condition to continuing the marriage. Such actions are not consistent with what is required of one in a confidential relationship. Therefore the agreement was invalid as a postnuptial

- 8 -

agreement under section 40-2-301, MCA, and the trial court dividing the marital property was not bound by it.

The only other possible interpretation of the agreement is as a separation agreement under section 40-4-201, MCA. This is the most likely interpretation because the agreement was executed at a time when the parties were separated and the agreement was made when at least the husband had one eye on divorce. See, section 40-4-201(1), MCA.

The husband contends that if the agreement was a separation agreement, the trial court was bound by it because it did not find that the agreement was "unconscionable," as required by section 40-4-201(2), MCA. Although it is true the trial court did not specifically find "unconscionability," (See finding no. XVI, supra), we believe the evidence supports a finding of "unconscionability" as a matter of law. We rely on the same evidence in finding "unconscionability" as a matter of law as we did in holding that the husband's actions were repugnant to what is required of one in a confidential relationship. The "agreement" was reached at a time when he was attempting to secure a greater cut of her property, and she was attempting to save the marriage. The marriage had been stormy from the start, and the husband himself admitted he was "surprised" when his wife's mother offered to have him join his wife in purchasing some of the Moran property. It is clear that the offer was made to encourage the husband to reconcile, but any such reconciliation was more form than substance.

Based on the circumstances surrounding the execution of the September 2, 1976 agreement, we hold it was "unconscionable" as a matter of law and the trial court

properly refused to divide the property according to its terms.

The final point to be addressed is the overall equity of the five-sixths/one-sixth split. We must admit such a division seems inequitable on its face. The well-established rule in Montana is:

> "The apportionment made by the District Court will not be disturbed on review unless there has been a clear abuse of discretion as manifested by a substantial inequitable division of the marital assets resulting in substantial injustice." In re the Marriage of Brown (Mont. 1978), 587 P.2d 361, 35 St.Rep. 1733.

Without more, a division awarding five-sixths to the wife would seem to be "substantially unjust." But it must be noted that the marriage was short-lived and rocky, this is the husband's fifth and the wife's third divorce, and, most significantly, a great majority of the property was acquired from the wife's family. We held in the case of In Re Marriage of Herron (Mont. 1980), 608 P.2d 97, that the source of the property was a major factor to be considered by the court dividing the property under section 40-4-202, MCA. In Herron, we held that the trial court had abused its discretion when it split the property 50/50, where "almost all of the property accumulated by the (husband and wife) can be traced to gifts or bequests from (the wife's father)."

"Almost all" of the marital property can be traced to the Morans, the wife's family. Clearly all the Moran property purchased in 1972 came from the Morans, and is being paid off from rental income from that property, without any financial contribution from the husband. The tract of land on the Rimrocks where the parties started constructing their new home was paid for by mortgaging the Moran residence on Mariposa, and the mortgage was then retired when the Mariposa

- 10 -

residence was sold. The husband did contribute some of his own money to purchase materials for the partial construction of the new home, and the trial court considered that fact when it awarded him $95,000 cash.

The only other real properties in which the husband had any equity were the Scott Building in Laurel, and the residence on Mariposa which the parties sold in 1974. The husband used his own funds to make the $11,600 downpayment on the Scott Building and also paid the first $8,574.81 installment. The last three installments were paid with rental income received from Moran property. The husband's $20,174.81 equity in the Scott Building was included in his cash award, as the trial court decided not to partition the property.

Regarding the residence on Mariposa, the husband did pay $15,000 for a one-half interest, but that was a bargain considering the house cost $32,000 to build and had appreciated. The other one-half interest was gifted to the parties by the wife's father. The trial court considered the husband's $15,000 contribution, and also considered the fact that because the wife's father had sold the home at such a bargain price, the parties were able to turn around the next year and sell it for $50,000. We find no error regarding the Scott Building or the Mariposa residence.

Because we believe the trial court properly considered all the required factors set forth in section 40-4-202, MCA, including the husband's efforts in helping to manage and maintain the Moran property, we hold that there was no clear abuse of discretion resulting in "substantial injustice" by awarding approximately five-sixths of the property to the wife and one-sixth to the husband.

The judgment is affirmed.

_Daniel J. Shea_
Justice

We Concur:

_L. C. Gulbrandson_

_John C. Sheehy_

_Frank B. Morrison_

_John Conway Harrison_
Justices