No. 90-526

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

IN RE THE MARRIAGE OF
MARY IRENE JOHNSTON,

       Petitioner and Appellant,

   v.

JOHN RICHARD JOHNSTON,

       Respondent and Cross-Appellant.

FILED

JUL 25 1991

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:  District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Russell Fillner, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

     Stephen C. Moses; Moses Law Firm, Billings, Montana

     For Respondent:

     Kenneth D. Tolliver and James C. Reuss; Wright,
Tolliver & Guthals, Billings, Montana

Submitted on Briefs: March 21, 1991

Decided: July 25, 1991

Filed:

_____
Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

Mary Irene Johnston appeals and John Richard Johnston cross-appeals from the division of marital property in the judgment dissolving their marriage, entered in the District Court of the Thirteenth Judicial District, Yellowstone County. We affirm.

Both parties raise the issue of whether the District Court erred in allocating the proceeds of certain stock in Coca-Cola Bottling Company of Bismarck, Inc. (Bismarck Bottling). John also raises the issue of whether the District Court erred in failing to take properly into consideration Mary's expected inheritance.

Mary Irene Johnston married John Richard Johnston on October 30, 1980, in Bellingham, Washington. Following their marriage, the couple resided in Bellingham. John was employed at a local Coca-Cola bottling company and Mary was employed at Rainier Brewing. The couple adopted one child who is now an adult.

Mary's father, Carl Boustead, resided in Bismarck, North Dakota, where he owned and operated Bismarck Bottling, a closely-held corporation. It was Carl's desire to have his family close to him and he oftentimes expressed his wish that Mary and John move to Bismarck.

In February 1982, Carl offered John employment at Bismarck Bottling. John accepted this offer and in June 1982, the parties moved to Bismarck. John proved to be a hard-working and diligent employee of Bismarck Bottling. He continually assumed more

responsibility within the company and was eventually promoted to operations manager in 1985.

In December 1982, Carl caused Bismarck Bottling to issue ten shares of its stock to John and Mary. A similar issue of ten shares was made to Mary's brother, Hunt, and his wife. Two years later, in December 1984, Bismarck Bottling issued another ten shares of its stock to John and Mary, and also to Hunt and his wife. In October 1985, Bismarck Bottling issued twenty shares of its stock to John and Mary and twenty shares to Hunt and his wife. In total, John and Mary were issued forty shares of Bismarck Bottling stock, which amounted to 11.85% of the issued stock.

In 1982, the value of Bismarck Bottling was between $3.2 and $4 million. Carl sold Bismarck Bottling in 1986 for approximately $10 million. John and Mary's 11.85% interest in Bismarck Bottling generated proceeds of $889,000 pre-tax and $689,000 after tax. The proceeds were placed in an investment account at First Bank in Bismarck. By way of additional deposits and reinvestment of earnings, the account grew in value to $866,071.

After Carl sold Bismarck Bottling in 1986, the new owners hired John as the plant manager. John remained as plant manager for approximately one year. Thereafter, John and Mary relocated to Billings, Montana. In August 1988 the couple separated, and in July 1989 the District Court dissolved their marriage.

In determining the property settlement, the court noted that Carl gave numerous gifts to the couple over a four-year period,

3

and, at the time of the dissolution, the value of these gifts exceeded the net worth of the couple. In addition to the Bismarck Bottling stock, these gifts included 1) cash used for payments on the parties' home in Bellingham; 2) the equity in a home in Bismarck owned by Carl, which the parties later sold, using the proceeds as a down-payment for another home; 3) automobiles; 4) cash used to purchase certificates of deposit; 5) cash used to build a garage; 6) cash used for home renovations; and 7) an educational trust for the parties' son.

In its findings, conclusions, and order dissolving the parties' marriage, the court awarded Mary, inter alia, all of the value of the Bismarck Bottling stock at the time the stock was sold and the proceeds invested. It awarded John half of the appreciation in the investment account which arose after the Bismarck Bottling stock was sold in 1986 and the proceeds thereof invested, totaling $82,581.29. The court later amended this property allocation and awarded John an additional $141,360 from the investment account "after consideration of the marital appreciation of the parties' ownership interest in [Bismarck Bottling] and [John's] marital contribution to that appreciation" from 1982 to 1986. From this order, Mary appeals and John cross-appeals.

I

Did the District Court err in allocating the proceeds of the sale of the Bismarck Bottling stock?

In determining the division of assets in a marriage dissolution, each case must be examined individually, with an eye to the unique circumstances before the court. In re Marriage of Jorgensen (1979), 180 Mont. 294, 299, 590 P.2d 606, 610 (citation omitted). A court must also consider the statutory criteria under § 40-4-202(1), MCA, and equitably apportion the marital assets. It is not necessary that an equitable distribution be an equal division of the marital assets. E.g., In re Marriage of Mayers (1984), 210 Mont. 173, 682 P.2d 718. Regarding marital assets traceable to gifts, § 40-4-202(1), MCA, provides:

> In dividing property . . . acquired by gift, bequest, devise, or descent . . . the court shall consider those contributions of the other spouse to the marriage, including:
>
> (a) the nonmonetary contribution of a home-maker;
>
> (b) the extent to which such contributions have facilitated the maintenance of this property; and
>
> (c) whether or not the property division serves as an alternative to maintenance arrangements.

Our standard of review is whether the District Court's distribution is based on substantial credible evidence. In re Marriage of Johns (1989), 238 Mont. 256, 258, 776 P.2d 839, 840. This Court will only overturn the findings of a district court where they represent a clear abuse of discretion. Johns, 776 P.2d at 840.

Mary argues that the District Court erred when it awarded John an additional $141,360 based on marital appreciation of the

Bismarck Bottling stock and John's marital contribution to that appreciation from 1982 to 1986. She asserts that because the stock was a gift from her father, it should be considered as principally a gift to her. Furthermore, she argues that the appreciation in the value of the stock occurred in 1986 and was substantially due to the unique franchise agreement held by her father, and not to any contribution John made to Bismarck Bottling from 1982 to 1986. Accordingly, she maintains that John is not entitled to any marital appreciation of the Bismarck Bottling stock for these years.

Mary cites In re the Marriage of Herron (1980), 186 Mont. 396, 608 P.2d 97. In Herron, this Court reversed a district court, holding that it abused its discretion when it allocated a 50/50 property division where most of the property of the marital estate was traceable to gifts or bequests from the wife's father. This Court further provided in Herron:

> George Robbins thus gifted or bequeathed over a quarter of a million dollars to the Herrons during the course of their marriage. The property was given to the Herrons jointly, but Mr. Robbins certainly did so to provide for his only daughter. The property should be considered as principally gifts to Mrs. Herron.

Herron, 608 P.2d at 100.

In the present case, there was a clear conflict in the evidence on the nature of the gifts of Bismarck Bottling stock from Carl to Mary and John. Carl testified that the stock was a gift intended for Mary's comfort and to effectuate his own estate plan.

6

However, John testified that the stock was given to him and Mary in recognition of his hard and diligent work in improving the financial position and the case sale position of Bismarck Bottling. The court initially agreed with Mary, as indicated in finding # 22:

> [t]hese gifts from Carl and his wife to John and Mary were motivated by Carl's desire to provide for his daughter's comfort and to effectuate an estate plan. The gifts were given to them jointly, but Carl did so to provide for his only daughter. Carl's gifts totalled more than the net worth of the parties. Accordingly, the marital estate should be considered as principally gifts to Mary.
> . . .

There is substantial evidence in the record to support this finding. However, in its amended findings of fact and judgment, at additional finding # 18, the court casts doubt on the continued vitality of its earlier finding by stating that John "was a joint recipient of the stock." John argues that, as a joint recipient of the stock, he was an acquiring spouse and is entitled to one-half of all of the investment account traceable to the proceeds of the Bismarck Bottling stock, not just the appreciation of the stock.

There were clear conflicts in the evidence on the reasons for the increased value of Bismarck Bottling between 1982 and 1986. Mary's expert testified that the increase in the value of the business occurred precipitously in 1986 due to the unique nature of the franchise agreement. In addition to his own testimony, John presented the testimony of the district manager for Coca Cola

7

during the years 1983 to 1986, who testified that, in his opinion, Carl was essentially retired from the business during those years and that John worked very hard at Bismarck Bottling as "an integral part of what happened there."

The District Court found, in its amended findings of fact and judgment at "additional finding of fact" # 18, that

> [g]iven the clear record as to respondent's contribution to the preservation and appreciation of the parties' stock in Coca-Cola Bottling of Bismark [sic], Inc., and the fact that the husband was a joint recipient of the stock, the Court finds it equitable to allocate one-half the appreciation to the husband, being $141,360.00.

That finding is supported by substantial evidence presented by John and supports the court's award to John of half of the marital appreciation of the parties' ownership in Bismarck Bottling. However, the court also left standing its finding # 22 that

> . . . John also asserts that he had contributed to the increase in value of the Carl's [sic] Coca-Cola business in Bismarck and that he increased the annual case sale by over 300,000 cases between 1982 and 1985. However, this was only a 7.4 percent average annual case sale increase as compared to an average annual case sale increase of 11 percent for the period 1974 through 1982. The substantial increase in the value of the company was related to the unique franchise agreement held by Carl, as well as other market conditions prevailing at the time of the sale.

The above findings of the District Court are internally inconsistent. However, the court did make findings which support its division of the marital estate. It found that the Bismarck

8

Bottling stock should be considered as principally a gift to Mary. It also found that John contributed to the preservation and appreciation of the stock. The absence of a 50/50 property distribution and the finding that John contributed to the preservation and appreciation of the stock distinguish this case from Herron. Without approving of the court's contradictory findings, we affirm the District Court's allocation of the proceeds of the Bismarck Bottling stock.

II

Did the District Court err in failing to take properly into consideration Mary's expected inheritance?

Section 40-4-202(1), MCA, provides that the court shall consider, inter alia, "future acquisition of capital assets and income" when apportioning a marital estate in a dissolution proceeding. Here, John argues that the court failed to adequately consider Mary's expected future inheritance upon Carl's death. Carl testified that he gave all the generous gifts to Mary and John for Mary's comfort and to effectuate an estate plan. He further testified that Mary could expect a "pittance" of any future inheritance following his death as he planned to devise his remaining estate, if any, to "some of my favorite charities and a fine hospital in Bismarck." Basing Mary's future acquisition on an inheritance to be received upon the death of her father is highly speculative and thus, inappropriate. We therefore hold that

the District Court did not err regarding consideration of Mary's expected inheritance.

Affirmed.

_____
E. A. Turnage
Chief Justice

We concur:

_____
John Conway Harrison

_____
William E. Hunt Sr.

_____
Karla M. Gray

_____
R. C. McDonough

_____


_____
Justices

10

Justice Terry N. Trieweiler dissenting.

I respectfully dissent from the opinion of the majority. I would reverse the District Court's failure to equally divide the proceeds from the sale of stock in the Bismarck Bottling Company, which was jointly owned by the parties.

The disposition of the disputed property is controlled by § 40-4-202(1), MCA, which requires that district courts "equitably apportion between the parties the property and assets belonging to either or both." (Emphasis added.)

That portion of § 40-4-202, MCA, which relates to the interest "of the other spouse" in property acquired by gift is not applicable to this case because the District Court made a specific finding of fact that the parties were joint recipients of the stock. The proceeds from the sale of the stock were deposited in a joint account and at all times dealt with as a marital asset prior to the entry of the divorce decree. To deny John any interest in the proceeds from the sale of jointly owned stock which had an after-tax value of $689,000 at the time of sale, was not equitable and was a clear abuse of the trial court's discretion.

The following facts illustrate the inequity of the property distribution in this case.

When John and Mary were married, John was employed by a Coca-Cola bottler in Bellingham, Washington. However, Carl Boustead preferred that his daughter return to Bismarck. Therefore, John and Mary were persuaded to return to Bismarck where

11

John took a reduction in salary to take a position in top management of Bismarck Bottling.

John worked in the sales department, the delivery force, the production team, the management team, and in the warehouse. He eventually became operations supervisor, and by 1985 was promoted to the position of operations manager. For all practical purposes, the day-to-day operations were managed by John while Mary's father spent more and more time relaxing at his winter home in Arizona.

From 1982 to 1985, John and Mary were jointly given 40 shares of stock in Bismarck Bottling which represented 11.85 percent of the total outstanding stock. In its Amended Findings of Fact, the court specifically found that the parties were joint recipients. It did not find that the stock was given to Mary alone.

There is no question that John contributed to the appreciation of the stock. The District Court specifically found that the value of total outstanding stock in Bismarck Bottling increased from $4 million in 1982, when John went to work for the company, to $10 million in 1986, when the company was sold. In other words, the value of the company increased by 150 percent under John's leadership.

There was no evidence, nor any specific findings by the District Court, that Mary did anything to contribute to the appreciation of Bismarck Bottling or the stock that was issued to the parties.

John was described by other employees at the plant as a hard worker who brought professionalism to the bottling business, while Mary's father and brother were depicted as being superficially and irregularly involved in the business's management.

After the Bismarck Bottling Company was sold in 1986, the new owners hired John as the plant manager. During the 12 months of operation prior to the sale, with Mary's family members involved in its management, the company produced profits in the neighborhood of $700,000. However, during the 12 months after acquisition, under John's sole management, the profits increased to $1.3 million.

When the bottling company was sold in 1986 for approximately $10 million, the parties' 11.85 percent interest generated proceeds of $889,000, which netted them $689,000 after taxes. The proceeds were placed in an investment account at First Bank of Bismarck.

As part of the sale, John executed a non-compete agreement, as well as a consulting agreement. The total contributions to the sale proceeds from John's consulting and non-compete agreements amounted to $112,157, which was also placed in the parties investment account. These proceeds had nothing to do with the stock gifted to Mary and John, and had nothing to do with any efforts on the part of Mary. Yet, the District Court's decree totally deprives John of this income which resulted directly and exclusively from his efforts.

Less than two months ago in Keedy v. Keedy (Mont. 1991), ___ P.2d ___, 48 St.Rep. 572, we affirmed a District Court decree which awarded Carol Keedy 50 percent of the appreciated value of baseball cards acquired by her husband as an 11-year-old boy which, for the most part, had been stored in his mother's garage in Nebraska during the couple's marriage.

It has been said that consistency is the hobgoblin of small minds. However, it certainly has a place in jurisprudence. If so, it would not be apparent to the average lawyer in Montana who tries to reconcile our two most recent decisions on the division of marital property.

In the Keedy case, pre-acquired marital property was, for all practical purposes, divided equally between the parties, even though the non-acquiring spouse contributed nothing to its appreciation. In this case, property which was given jointly to both parties was distributed exclusively to the spouse who contributed nothing to its appreciation.

I believe the district courts of this state deserve better guidance than this regarding future disposition of marital and non-marital property.

For these reasons, I would reverse the District Court's disposition of the parties' joint investment account, and divide it equally between Mary and John.

_____
Justice

14