205 P.3d 548

**Martin David SCHILLER,**
**Plaintiff–Appellant,**

v.

**Janet Louise SCHILLER,**
**Defendant–Appellee.**

No. 27225.

Intermediate Court of Appeals of Hawai'i.

March 19, 2009.

Thomas L. Stirling, Jr., Darcy H. Kishida (Stirling & Kleintop), Honolulu, on the briefs, for Plaintiff–Appellant.

Everett Cuskaden, Ryan Cuskaden (Everett Cuskaden & Associates, AAL, ALC), Honolulu, on the briefs, for Defendant–Appellee.

FOLEY, Presiding Judge, NAKAMURA and FUJISE, JJ.

Opinion of the Court by FOLEY, J.

Plaintiff–Appellant Martin David Schiller (Martin) appeals from the following orders and decrees filed in the Family Court of the First Circuit (family court) [1]:

(1) "Order Regarding Plaintiff's Motion for Reconsideration, Filed on February 22, 2002" (Order re 2/22/02 Motion for Reconsideration), filed on May 21, 2002;

(2) "Order Denying Plaintiff's Second Motion for Reconsideration Filed May 31, 2002" (Order Denying 5/31/02 Motion for Reconsideration), filed on July 25, 2002;

(3) "Decree of Absolute Divorce" (original Divorce Decree), filed on August 6, 2002;

(4) "Order Upon Remand" (Order Upon Remand), filed on December 20, 2004;

(5) "Order Denying Plaintiff's Motion for Reconsideration Filed December 30, 2004" (Order Denying 12/30/04 Motion for Reconsideration), filed on March 8, 2005; and

(6) "First Amended Decree of Absolute Divorce" (First Amended Divorce Decree), filed on April 1, 2005.

On appeal, Martin argues the following points of error:

(1) In a May 4, 2004 Memorandum Opinion, the Intermediate Court of Appeals (this court or ICA) specifically vacated Findings of Fact (FOFs) 28 and 46 through 52 and Conclusion of Law (COL) 3 of the family court's November 21, 2002 Findings of Fact and Conclusions of Law (11/21/02 FOFs/COLs). Nevertheless, the family court erroneously "reissued" every one of the vacated FOFs and the vacated COL in its June 15, 2005 Findings of Fact and Conclusions of Law

---

1. The Honorable Gale L.F. Ching presided.

(6/15/05 FOFs/COLs) as FOFs 34, 54 through 56, 62, and 65 through 68 and COL 4. Therefore, of the 6/15/05 FOFs/COLs, FOFs 34, 54 through 56, 62, and 65 through 68 are clearly erroneous and COL 4 is wrong.

(2) The family court erred by deviating from Hawai'i's Marital Partnership Principles and awarding Defendant–Appellee Janet Louise Schiller (Janet) a disproportionately large share of the marital property of Janet and Martin (collectively, the parties) without identifying any valid and relevant considerations (VARCs) that would justify such a deviation. Related to this argument is Martin's contention that FOFs 10, 13 through 18, 20 through 22, 25 through 30, 33, 34, 36, 40 through 42, 45 through 49, 51 through 57, 61, 72, 73, 75, 78 through 80, 84 through 86, 88 through 92, 94, 96 through 105, 113, 115, 117, 131, 138, and 141 through 143 are clearly erroneous and COLs 5, 7 through 9, 12, 19 through 23, 26, and 28 are wrong.

(3) Martin's interest in California commercial real estate, which we will refer to as "Garnet," is marital separate property, not subject to equitable distribution. Related to this argument is Martin's claim that FOF 131 is clearly erroneous and COL 26 is wrong. He argues in the alternative that even if the family court were correct that Garnet was not marital separate property, the court nevertheless erred in classifying it as Category 5 property, when it would be Category 3 property.

Martin requests that this court set aside in pertinent part and/or modify the August 7, 2001 Minute Order; Order Re 2/22/02 Motion for Reconsideration; original Divorce Decree; Order Upon Remand; Order Denying 12/30/04 Motion for Reconsideration; and First Amended Divorce Decree to reflect the appropriate division of the parties' property and the equalization of payment described in Martin's opening brief.

## I.

This case arises out of Martin and Janet's divorce, which was finalized on April 1, 2005. The parties married on October 4, 1969 and separated in contemplation of divorce in September 1998, when Janet moved out of the Honua Street marital residence (Honua residence) and into the Missouri Avenue residence (Missouri residence) in California. The parties have two adult children: Son, born in 1970, and Daughter, born in 1975. In the 6/15/05 FOFs/COLs, the family court made numerous findings and conclusions regarding, inter alia, Martin and Janet's relative standards of living, ability to work, and spending habits since they separated.

## II.

### A. Family Court Decisions

■ Generally, the family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion. Thus, [an appellate court] will not disturb the family court's decisions on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

*Fisher v. Fisher*, 111 Hawai'i 41, 46, 137 P.3d 355, 360 (2006) (quoting *In re Doe*, 95 Hawai'i 183, 189–90, 20 P.3d 616, 622–23 (2001)).

### B. Partnership Model Division

■ The Partnership Model requires the family court, when deciding the division and distribution of the Marital Partnership Property of the parties part of divorce cases, to proceed as follows: (1) find the relevant facts; start at the Partnership Model Division and (2)(a) decide whether or not the facts present any [VARCs] authorizing a deviation from the Partnership Model Division and, if so, (b) itemize those considerations; if the answer to question (2)(a) is "yes," exercise its discretion and (3) decide whether or not there will be a deviation; and, if the answer to question (3) is "yes," exercise its discretion and (4) decide the extent of the deviation.

Question (2)(a) is a question of law. The family court's answer to it is reviewed under the right/wrong standard of review. Questions (3) and (4) are discretionary matters. The family court's answers to them are reviewed under the abuse of discretion standard of appellate review.

*Jackson v. Jackson,* 84 Hawai'i 319, 332–33, 933 P.2d 1353, 1366–67 (App.1997) (footnote omitted).

### C. Credibility

■ [I]t is axiomatic that reconciling conflicting testimony is beyond the scope of appellate review. *See State v. Martinez,* 101 Hawai'i 332, 340, 68 P.3d 606, 614 (2003) ("But '[i]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact.'") ...; *State v. Mitchell,* 94 Hawai'i 388, 393, 15 P.3d 314, 319 (App.2000) ("The appellate court will neither reconcile conflicting evidence nor interfere with the decision of the trier of fact based on the witnesses' credibility or the weight of the evidence.")[.]

*Onaka v. Onaka,* 112 Hawai'i 374, 384, 146 P.3d 89, 99 (2006).

### D. Motion for Reconsideration

■ The purpose of a motion for reconsideration is to allow the parties to present new evidence and/or arguments that could not have been presented during the earlier adjudicated motion. Reconsideration is not a device to relitigate old matters or to raise arguments or evidence that could and should have been brought during the earlier proceeding. We review a trial court's ruling on a motion for reconsideration under the abuse of discretion standard. An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

*Tagupa v. Tagupa,* 108 Hawai'i 459, 465, 121 P.3d 924, 930 (App.2005) (internal quotation marks, citations, ellipsis, and brackets omitted).

### E. Findings of Fact

■ "[FOFs] are reviewed under the clearly erroneous standard. A[n FOF] is clearly erroneous when (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the defi-

nite and firm conviction that a mistake has been made." *Clark v. Clark,* 110 Hawai'i 459, 465, 134 P.3d 625, 631 (App.2006) (internal quotation marks, citations, ellipsis, and brackets in original omitted) (quoting *Kienker v. Bauer,* 110 Hawai'i 97, 105, 129 P.3d 1125, 1133 (2006)).

### F. Conclusions of Law

■ A COL is not binding upon an appellate court and is freely reviewable for its correctness. [An appellate] court ordinarily reviews COLs under the right/wrong standard. Thus, a COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned. However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case.

*Chun v. Bd. of Trs. of the Employees' Ret. Sys. of the State of Hawai'i,* 106 Hawai'i 416, 430, 106 P.3d 339, 353 (2005) (internal quotation marks, citations, and brackets in original omitted) (quoting *Allstate Ins. Co. v. Ponce,* 105 Hawai'i 445, 453, 99 P.3d 96, 104 (2004)).

### G. Harmless Error

Hawaii Rules of Evidence (HRE) Rule 103(a) provides that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."

### III.

### A. Vacated FOFs/COLs

In this court's unpublished May 4, 2004 Memorandum Opinion, *Schiller v. Schiller,* 104 Hawai'i 384, 90 P.3d 276, 2004 WL 1058636 (App.2004), we specifically vacated FOFs 28 and 46 through 52 and COL 3 of the family court's 11/21/02 FOFs/COLs. *Id.* at *12. Martin contends the family court erroneously "reissued" every one of the vacated FOFs and the COL as FOFs 34, 54 through 56, 62, and 65 through 68 and COL 4 in its 6/15/05 FOFs/COLs. Martin argues that FOFs 34, 54 through 56, 62, and 65 through 68 are therefore clearly erroneous

and COL 4 is wrong and this court should vacate them.

On August 6, 2002, the family court filed its original Divorce Decree, which entered orders pertaining to the following discrete parts of this divorce case: (1) dissolution of the marriage; (2) spousal support; and (3) division and distribution of property and debts. The family court subsequently entered its 11/21/02 FOFs/COLs.

In *Schiller*, this court explained that Martin argued on appeal that in its Divorce Decree, the district family court had

(1) ignored compelling evidence adduced at trial and awarded [Janet] a grossly disproportionate share of the marital estate; (2) misapplied Hawaii's well-established Marital Partnership Principles and divided the parties' estate in violation of the meaning and intent of Hawaii Revised Statutes (hereinafter "HRS") § 580–47 (Supp.2003); and (3) failed to identify and explain any [VARCs] that would justify such a stunning deviation from Marital Partnership Principles.

2004 WL 1058636 at *9 (brackets in original and brackets added).

We noted that "Hawaii divorce cases involve a maximum of four discrete parts: (1) dissolution of the marriage; (2) child custody, visitation, and support; (3) spousal support; and (4) division and distribution of property and debts," *id.* at *11 (citing to *Black v. Black*, 6 Haw.App. 493, 728 P.2d 1303 (1986)), and that an order in a divorce decree "which finally decides part (1) is final and appealable when decided even if parts (2), (3), and (4) remain undecided; that parts (2), (3), and (4) are each separately final and appealable as and when they are decided, but only if part (1) has previously or simultaneously been decided." *Schiller*, 2004 WL 1058636 at *11.

As set forth in *Schiller*, orders in the original Divorce Decree regarding division and distribution of property and debts provided the following:

D) Personal Effects. Each party is awarded his or her own personal effects, clothing, and jewelry. If there is a dispute as to any particular item of item [sic], then the parties shall submit an agreed upon

list of such disputed items to the Court and the Court shall then render a decision as to such disputed properties.

E) Household Furniture, Furnishings and Effects. The parties' household goods and effects, and their furniture and appliances are to be divided by mutual agreement. If there is a dispute as to any particular item of item [sic], then the parties shall submit an agreed upon list of such disputed items to the Court and the Court shall then render a decision as to such disputed properties. In *Eaton v. Eaton*, 7 Haw.App. 111, 113–119, 748 P.2d 801, 804–806 (1987), this court stated, in relevant part as follows:

In relevant part, the August 6, 1986 FOF & COL state:

CONCLUSIONS OF LAW

. . . .

6. The personal property of the Plaintiff and Defendant which have [sic] not yet been distributed should be divided in such a manner agreeable to the parties so that each receives approximately equal value.

*Id.* at *10.

We held that "parts (1) and (3) [of the original Divorce Decree] were final and appealable," but part (4) was "not final and appealable because the district family court has not fully and finally divided and distributed all of the property and debts of [Martin and Janet] over which it had jurisdiction." *Id.* at *11. We went on to hold:

In many divorce cases, the family court expressly specifically and/or generally finally divides and distributes all of the property and debts of the parties over which it has jurisdiction. We recommend this practice in all cases. In some divorce cases, the family court expressly divides and distributes some of the property and debts of the parties and implicitly divides and distributes the remainder. *See DeMello v. DeMello*, 3 Haw.App. 165, 646 P.2d 409 (1982); *Jendrusch v. Jendrusch*, 1 Haw.App. 605, 623 P.2d 893 (1981). In this case, the district family court neither expressly nor implicitly divided and dis-

tributed the personal property of the parties.

*Id.*

We concluded that we had appellate jurisdiction to decide the appeal of part (3), spousal support and that

[t]he connection between the part of the [original] Divorce Decree pertaining to spousal support and the part pertaining to the division and distribution of the property and debts motivates us to vacate part 4.A of the [original] Divorce Decree, [FOFs] nos. 28 and 46–52, and COL no. 3,[2] and to remand the spousal support part of this case for a final decision when the division and distribution of property and debts part of this case is finally decided.

*Id.* at *12 (footnote not in original).

The family court held a "remand conference" and, on December 20, 2004, entered the Order Upon Remand as to the division of personal property and spousal support. The operative part of the order stated:

1. *PERSONAL PROPERTY.* The Court having been advised by counsel that the parties have already divided all of their tangible personal property to their satisfaction, and that there are no items in dispute, it is hereby ordered that each party should be, and is hereby awarded all items of tangible personal property in his or her possession or control.

2. FOFs 28 and 46 through 52, and COL 3 of the 11/21/02 FOFs/COLs pertained to spousal support and provided the following:

### FINDINGS OF FACT

. . . .
28. [Janet] will have to live off of the stock and assets awarded to her by selling them as needed and also paying capital gains taxes which may be incurred.
. . . .
46. [Janet] will have to sell the stocks in her portfolios to meet her expenses.
47. [Janet] has no income or any assurance of future income as is the case with [Martin].
48. [Janet] has no ability to continue with any sort of career as is the case with [Martin].
49. [Janet] presented evidence through her expert, Mr. William McRoberts, to address meeting [Janet's] future expenses and needs based upon the use of the retirement and stock accounts.

2. *ALIMONY CONSIDERATIONS.* The Court finds that, *in making its original decision:*
 (a) Although [Janet] was entitled to receive alimony from [Martin],
 (b) Rather than order [Martin] to pay that amount to [Janet] as alimony, however, the Court deviated and instead awarded to [Janet] additional assets as and for property division.
3. *DECREE.* [Janet's] counsel shall prepare a "First Amendment to Decree of Absolute Divorce" to include terms consistent with this Court Order.

(Emphasis in first sentence of ¶ 2 added.)

On December 30, 2004, Martin filed a motion for reconsideration of the alimony provision of the Order Upon Remand. Martin argued that the family court "still has not adequately addressed the ICA's second concern relating to spousal support, and how that issue interrelates with the property division issues in this case."

On March 8, 2005, the family court filed an order denying the motion for reconsideration of the alimony provision of the Order Upon Remand.

On April 1, 2005, the family court filed the First Amended Divorce Decree, which had been prepared by Janet's counsel. The decree reiterated the provisions of the Order Upon Remand regarding personal property and alimony and repeated all other provi-

50. This Court finds that if [Janet] is awarded $748,191, based upon an "aggressive 7% assumption" on a rate of return, the funds would be consumed in eighteen (18) years, eight (8) months, when [Janet] reaches the age of 81.
51. This Court finds that if [Janet] is awarded $559,824, based upon an "aggressive 7% assumption" on a rate of return, the funds would be consumed in 10 years, when [Janet] reaches the age of 73.
52. No credible evidence refuted the opinions of Mr. McRoberts. The Court has the obligation to look at the condition that a party is left at the time of the divorce. In this instance, [Janet] will be left in a position that will not provide for her future well being unless she is awarded sufficient funds to provide for her future welfare.
COL 3 provided, "This Court is ordering a property division in lieu of an award of alimony at the current time to [Janet]."

sions of the original Divorce Decree. With regard to alimony, the First Amended Divorce Decree provided in relevant part:

4. *Personal and Real Property Matters.* The personal and real property matters covered by this decree are as follows:

A) *Alimony.* The Court finds that, *in making its original decision:*

(1) that [Janet] was entitled to receive alimony from [Martin],

(2) Rather than order [Martin] to pay that amount to [Janet] as alimony, however, the Court deviated and instead awarded to [Janet] additional assets as and for property division.

(Emphasis in ¶ A added.)

In the 6/15/05 FOFs/COLs, FOFs 34, 54 through 56, 62, and 65 through 68 and COL 4 provided:

### FINDINGS OF FACT

. . . .

34. [Janet] will have to live off of the stock and assets awarded to her by selling them as needed.

. . . .

54. [Janet] will have to sell the stocks in her portfolios to meet her necessary expenses.

55. [Janet] does not have any income or assurances of future income, unlike [Martin].

56. [Janet] does not have the ability to continue with any sort of career, unlike [Martin].

. . . .

62. [Janet's] expert, Mr. William McRoberts, addressed the issue of [Janet] meeting her future expenses and needs based upon the utilization of her retirement and stock accounts.

. . . .

65. [Martin] did not submit any evidence refuting Mr. McRoberts' opinions.

66. This Court accepts Mr. McRoberts' opinions and finds that if [Janet] is awarded $748,191, based upon an "aggressive 7% assumption" rate of return, the funds would be consumed in 18 years

and 8 months, when [Janet] reaches the age of 81.

67. This Court accepts Mr. McRoberts' opinions and finds that if [Janet] is awarded $559,824, based upon an "aggressive 7% assumption" rate of return, the funds would be consumed in 10 years, when [Janet] reaches the age of 73.

68. This Court finds that [Janet] will be left in a position that will not provide for her future and well being unless she is awarded assets sufficient enough to provide for her future welfare.

. . . .

### CONCLUSIONS OF LAW

. . . .

4. While this Court believes that [Janet] is entitled to post divorce spousal support, the deviation by this Court in awarding [Janet] more than 50% of the marital estate negates the need to specifically award spousal support to [Janet] and no separate order for spousal support is entered.

#### 1. "Reissuance" of spousal support FOFs/COLs

In *Schiller,* this court held that the family court had not expressly or implicitly divided and distributed the parties' personal property, and we remanded this case back to the family court for a final decision on that issue. 2004 WL 1058636 at *11–12. Further, this court held that

the connection between the part of the [original] Divorce Decree pertaining to spousal support and the part pertaining to the division and distribution of the property and debts motivates us to vacate part 4.A of the [original] Divorce Decree, [FOFs] nos. 28 and 46–52, and COL no. 3, and to remand the spousal support part of this case for a final decision when the division and distribution of property and debts part of this case is finally decided.

*Id.* at *12.

In the Order Upon Remand, the family court finally decided the division and distribution of the parties' personal property:

1. *PERSONAL PROPERTY.* The Court having been advised by counsel that the parties have already divided all of their tangible personal property to their satisfaction, and that there are no items in dispute, it is hereby ordered that each party should be, and is hereby awarded all items of tangible personal property in his or her possession or control.

■ In its June 15, 2005 FOFs/COLs, the family court stated: "While this Court believes that [Janet] is entitled to post divorce spousal support, the deviation by this Court in awarding [Janet] more than 50% of the marital estate negates the need to specifically award spousal support to [Janet] and no separate order for spousal support is entered."

The circuit court did not err by entering the June 15, 2005 FOFs/COLs regarding spousal support, even though they were substantially similar to the court's 11/21/02 FOFs/COLs on that issue. In *Schiller*, this court merely instructed the family court to make a final decision on the division and distribution of the parties' marital property and debts, then reconsider spousal support in light of that decision. Apparently, upon reconsideration, the court found no need to change its prior decision regarding spousal support.

### B. Marital Partnership Principles/VARCs

Martin argues that the family court erred by deviating from Hawai'i's Marital Partnership Principles and awarding Janet a disproportionately large share of the parties' marital property without identifying any VARCs that would justify such a deviation.

In *Prell v. Silverstein*, 114 Hawai'i 286, 162 P.3d 2 (App.2007), this court stated the following with regard to general principles governing divorce distribution of property:

HRS § 580–47 (2006 Repl.) provides . . . in relevant part, as follows:

**Support orders; division of property.** (a) Upon granting a divorce, or thereafter if, in addition to the powers granted in subsections (c) and (d), jurisdiction of those matters is reserved under the decree by agreement of both parties or by order of court after finding that good cause exists, the court may make any further orders as shall appear just and equitable (1) compelling the parties or either of them to provide for the support, maintenance, and education of the children of the parties; (2) compelling either party to provide for the support and maintenance of the other party; (3) finally dividing and distributing the estate of the parties, real, personal, or mixed, whether community, joint, or separate; and (4) allocating, as between the parties, the responsibility for the payment of the debts of the parties whether community, joint, or separate, and the attorney's fees, costs, and expenses incurred by each party by reason of the divorce. In making these further orders, the court shall take into consideration: the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens imposed upon either party for the benefit of the children of the parties, and all other circumstances of the case. In establishing the amounts of child support, the court shall use the guidelines established under section 576D–7. Provision may be made for the support, maintenance, and education of an adult or minor child and for the support, maintenance, and education of an incompetent adult child whether or not the petition is made before or after the child has attained the age of majority.

In addition to any other relevant factors considered, the court, in ordering spousal support and maintenance, shall consider the following factors:

(1) Financial resources of the parties;

(2) Ability of the party seeking support and maintenance to meet his or her needs independently;

(3) Duration of the marriage;

(4) Standard of living established during the marriage;

(5) Age of the parties;

(6) Physical and emotional condition of the parties;

(7) Usual occupation of the parties during the marriage;

(8) Vocational skills and employability of the party seeking support and maintenance;

(9) Needs of the parties;

(10) Custodial and child support responsibilities;

(11) Ability of the party from whom support and maintenance is sought to meet his or her own needs while meeting the needs of the party seeking support and maintenance;

(12) Other factors which measure the financial condition in which the parties will be left as the result of the action under which the determination of maintenance is made; and

(13) Probable duration of the need of the party seeking support and maintenance.

. . . .

(b) An order as to the custody, management, and division of property and as to the payment of debts and the attorney's fees, costs and expenses incurred in the divorce shall be final and conclusive as to both parties subject only to appeal as in civil cases. The court shall at all times, including during the pendency of any appeal, have the power to grant any and all orders that may be necessary to protect and provide for the support and maintenance of the parties and any children of the parties to secure justice, to compel either party to advance reasonable amounts for the expenses of the appeal including attorney's fees to be incurred by the other party, and to amend and revise such orders from time to time.

The Hawai'i Supreme Court has stated that the foregoing statute confers "wide discretion upon the family court." *Gussin v. Gussin,* 73 Haw. 470, 479, 836 P.2d 484, 489 (1992). However,

in adjudicating the rights of parties to a divorce, the family court strives for a certain degree of uniformity, stability, clarity or predictability in its decision-making and thus [family court judges] are compelled to apply the appropriate law to the facts of each case and be guided by reason and conscience to attain a just result. The partnership model is the appropriate law for the family courts to apply when exercising their discretion in the adjudication of property division in divorce proceedings.

*Tougas v. Tougas,* 76 Hawai'i 19, 28, 868 P.2d 437, 446 (1994) (citations, internal quotation marks, and brackets omitted).

Under general partnership law, "each partner is entitled to be repaid his [or her] contributions to the partnership property, whether made by way of capital or advances." 59A *Am.Jur.2d Partnership* § 476 (1987) (footnotes omitted). *Absent a legally permissible and binding partnership agreement to the contrary,* "partners share equally in the profits of their partnership, even though they may have contributed unequally to capital or services." *Id.* § 469 (footnotes omitted). Hawaii partnership law provides in relevant part as follows:

**Rules determining rights and duties of partners.** The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules:

(a) Each partner shall be repaid the partner's contributions, whether by way of capital or advances to the partnership property and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; and must contribute towards the losses, whether of capital or otherwise, sustained by the partnership according to the partner's share in the profits.

*Gardner v. Gardner,* 8 Haw.App. 461, 464–65, 810 P.2d 239, 242 (1991) (quoting HRS § 425–118(a) (1985)). *Therefore, if there is no agreement between the husband and wife defining the respective property interests,* partnership principles dictate an equal division of the marital estate "where the only facts proved are the marriage itself and the existence of jointly

owned property." *Gussin*, 73 Haw. at 484, 836 P.2d at 491 (quoting *Hashimoto [v. Hashimoto]*, 6 Haw.App. [424,] 427 n. 4, 725 P.2d [520,] 522 n. 4 (1986)).

*Id.* at 27–28, 868 P.2d at 445–46 (emphases added).

In *Hussey v. Hussey*, 77 Hawai'i 202, 881 P.2d 1270 (App.1994), this court construed *Tougas* as establishing three classifications of property that must be divided and distributed in a divorce proceeding:

**Premarital Separate Property.** This was the property owned by each spouse immediately prior to their marriage or cohabitation that was concluded by their marriage. Upon marriage, this property became either Marital Separate Property or Marital Partnership Property.

**Marital Separate Property.** This is the following property owned by one or both of the spouses at the time of the divorce:

. . . .

c. All property that (1) was acquired by the spouse-owner during the marriage by gift or inheritance, (2) was expressly classified by the donee/heir-spouse-owner as his or her separate property, and (3) after acquisition, was maintained by itself and/or sources other than one or both of the spouses and funded by sources other than marital partnership income or property.

**Marital Partnership Property.** All property that is not Marital Separate Property.

*Id.* at 206–07, 881 P.2d at 1274–75.

114 Hawai'i at 291–94, 162 P.3d at 7–10 (footnotes omitted; emphasis in original; brackets in original and brackets added).

Martin argues that the family court erred by deviating from the Partnership Model Division, and he makes the following claims in support of this argument.

**1. Value of Missouri residence and the parties' furniture and household goods**

▬ Martin contends that FOF 138 is clearly erroneous. FOF 138 provides:

138. This Court finds that the assessed value for the Missouri [residence] to be $338,000 [Ex L] and the balance of the mortgage to be $252,700. [Ex G] This Court further finds that the net market value of the Missouri [residence] is $85,300.

Exhibit "L" in evidence is an "Annual Property Tax Bill," showing a "Net Taxable Value" for the Missouri residence of $338,035. Exhibit "G" in evidence is Janet's "Asset and Debt Statement" and indicates that the "Total Debt Owed" on the Missouri residence is $252,700.

Martin claims that Janet estimated the property's value at $420,000 and that the mortgage balance is approximately $252,700, leaving a net market value of $167,300. He adds that the family court should have at least assigned a $147,300 value to the property, given Janet's assertion in an e-mail (Exhibit 25 in evidence) to him that the value of the property was $400,000.

The family court was within its discretion to rely upon the "Annual Property Tax Bill" and Janet's Asset and Debt Statement in calculating the net market value of the Missouri residence. It is well-settled that an appellate court will not pass upon issues dependent on the weight of the evidence, which is the province of the trier of fact. *Onaka*, 112 Hawai'i at 384, 146 P.3d at 99.

▬ Martin further contends that FOFs 113 and 115 are clearly erroneous. FOFs 113 and 115 provide:

113. [Martin's] asset and debt statements reflect various claimed values for the marital household goods in Hawaii. His stated value on August 28, 2000 [exhibit A] reflects a $40,000 value, his asset and debt statement signed May 25, 2001 reflects a $30,000 value [exhibit B], his May 30, 2001 asset and debt statement [exhibit C] reflects a $50,000 value. The value on the July 27, 2001 statement [exhibit 1], filed by [Martin] on the eve of trial reflects a $20,000 value and an additional $12,000 value for household goods owned by [Martin].

. . . .

115. This Court finds that the value of the furniture and electronic equipment in Hawaii to be $40,000.00, which is a value that falls within the many values [Martin] claimed. Said furniture and electronic equipment are awarded to [Martin].

(Emphasis added.)

Martin argues that FOF 113 is clearly erroneous because he does not own an additional $12,000 in household goods. He asserts that the family court mistakenly attributed $12,000 he had in a USAA Subscriber's Savings Account to household goods owned by him.

It appears that the family court did confuse $12,000 Martin assigned to his USAA Subscriber's Savings Account with $12,000 in additional household goods owned by Martin. Thus, the underlined portion of FOF 113 is clearly erroneous. Nevertheless, we do not see how the error could have affected Martin's substantial rights as the $40,000 in household goods awarded was within the range of values reported by Martin, and we hold that it was harmless.

Martin also maintains that FOF 115 is clearly erroneous because the finding is based on estimates contained in his asset and debt statements completed between August 28, 2000 and July 27, 2001; he argues that the finding should be based on his most recent asset and debt statement alone, in which he stated that the household goods in Hawai'i *and* Los Angeles were worth $20,000. Martin asserts that the actual value of the household items he retained is $15,000, estimating that Janet retained $5,000 of the household items. He adds that FOF 115 is also wrong because it was based on the court's finding in FOF 113 that he owned an additional $12,000 in household goods.

As for Martin's assertion that the family court should have relied upon his most recent asset and debt statement in determining the value of the parties' furniture and electronic equipment, he states that "[i]t should go without saying that the most recent estimate made 'on the eve of trial' is the most accurate, as more reliable and complete information became available to [Martin]." Martin provides no authority for that assertion, and we find none. It is well-settled that an appellate court will not pass upon issues dependent on the weight of the evidence, which is the province of the trier of fact. *Onaka,* 112 Hawai'i at 384, 146 P.3d at 99. Therefore, we hold that FOF 115 is not clearly erroneous. With regard to Martin's argument that FOF 115 is based on the family court's finding in FOF 113 that he owned an additional $12,000 in household goods, as we have already stated, the court's finding constituted harmless error.

### 2. Employment prospects

Martin maintains that Janet's future employment prospects are at least as promising as his. Among other things, he argues that he will not be able to resurrect his failed advertising career; "[t]he primary difference between the parties ... is not one of ability, but of *willingness* to work"; Janet's health problems are merely *potentially* debilitating; Janet is not computer illiterate and could easily learn software commonly used in business today; and Janet continued to be a successful realtor in Hawai'i after the "Japanese bubble" burst. (Emphases in original.)

Related to this point of error is Martin's claim that FOFs 20 through 22, 25 through 30, 33, 34, 36, 49, 51 through 57, and 61 are clearly erroneous and COL 5 is wrong because they are not supported by the evidence in the record.

The FOFs provide:

20. There is a significant difference in the ability of each party to gainfully support themselves after the divorce.

21. There is a significant difference in their respective future employment prospects.

22. This Court finds that [Janet] has significant ongoing health problems, which include: borderline osteoporosis, severe osteoarthritis in her fingers with resulting pain, pain to her knee and shoulder areas, no vision in her left eye (she is fitted with an artificial eye), tearing in her right retina resulting in possible sudden blindness, and has been diagnosed and treated for squamous cell skin

cancer. In addition, [Janet] has been undergoing medical tests for gastrointestinal problems. [EX DDD1, DDD2, DDD3, DDD4, DDD5, DDD6, DDD7, DDD8]

. . . .

25. [Janet] had been a successful real estate agent in Hawaii during the period of the "Japanese bubble."

26. [Janet's] skin cancer significantly reduced her job opportunities in the real estate field due to an inability to be in the sun.

27. [Janet] looked for employment in California but was not successful in obtaining a job due to her poor health, age, and lack of computer program knowledge.

28. There was no credible evidence produced that [Martin's] four angioplasties in any way prevented him from working and continuing to work in his chosen field.

29. This Court finds that [Janet's] age, lack of computer program knowledge, and the aforementioned health problems drastically limit her ability to work.

30. The health issues and related conditions of both parties are [VARCs] the Court has considered in arriving at its decision.

. . . .

33. [Janet] does not have a business network or resources in California in the field of real estate field [sic] and does not have any viable source of income other than her stock portfolio.

34. [Janet] will have to live off of the stock and assets awarded to her by selling them as needed.

. . . .

36. [Martin] has been in the advertising field for over 30 years, and maintains ongoing business contacts and networks that will continue to serve him in his business endeavors.

. . . .

49. This Court finds that [Martin] intends to continue to "serve clients personally" along with the assistance of others "working as independent contractors,"

evidencing an intent and ability for [Martin] to continue working in his profession and field despite his filing for corporate bankruptcy. [Ex 44]

. . . .

51. [Martin] owns a second company The Schiller Agency, LLC, which that [sic] was not part of his corporate bankruptcy and which owns the lease of his corporate office.

52. [Martin] has the ability and the opportunity to continue and maintain a successful and lucrative career.

53. This Court finds that the evidence presented demonstrates that [Martin] has the skills, abilities, business contracts and business networks which will enable him to continue earning income post divorce, whereas [Janet] does not have the same occupational opportunities.

54. [Janet] will have to sell the stocks in her portfolios to meet her necessary expenses.

55. [Janet] does not have any income or assurances of future income, unlike [Martin].

56. [Janet] does not have the ability to continue with any sort of career, unlike [Martin].

57. These are [VARCs] the Court has considered in arriving at its decision.

. . . .

61. The post divorce abilities and circumstances of both parties to continue to work in their chosen fields are [VARCs] the Court has considered in arriving at its decision.

COL 5 provides:

5. This Court concludes that [Janet's] employment prospects post-divorce are extremely limited and her ability to earn sufficient income to support herself is also very limited. [Martin], on the other hand, has in place the "infrastructure," business networks, and abilities to continue in his profession and line of work. [Martin's] and [Janet's] relative employment opportunities, and their abilities post divorce, including the relative

health of both parties, are considered by this Court to be [VARCs].

### a. Martin's work prospects

At trial, Martin testified that after his company, The Schiller Group (TSG), filed for bankruptcy, he created The Schiller Agency, LLC through which he rented an office where he could "try and continue to serve clients or if not serve clients, just to have a place to go to try and finalize the agency."

Martin testified that two former TSG employees might start their own advertising agency and if they did so, they would probably get two-thirds of TSG's business. He stated that it was possible he would not have enough clients "even though [he was] getting support by the clients, both in the media as well as phone calls," because those clients might hire his employees instead. He was not sure if he could get a job or even sustain himself and did not know how he was going to generate any money. He stated that it was "a reality" he might go work for someone else, although he was "not quite sure who would want to hire [him]."

Martin testified that he had had four angioplasties since 1999 and had to go to California for each one because no cardiologist in Hawai'i would operate on him. Martin stated that he was not in pain at the time of trial.

Martin testified that the following statement from a bankruptcy court timetable was written by his bankruptcy attorney:

[Martin] wants to continue to serve clients as he has for many years and needs to make a living. He will continue his work in the advertising business as a sole proprietor.

He will serve clients personally and with the assistance of others including former TSG staff working as independent contractors. He intends in the very near future to begin ... operating a new agency, to re-hire as many members of TSG staff as possible, and to continue providing the best advertising services and advice in Hawai'i.

Martin testified that "[t]hese were notes from my attorney. These are not my notes." He added that in the statement, his attorney had taken "the liberty of putting down thoughts that he thought would be helpful to me when I talk with the staff and meet with the press. He subjectively said, Here are some thoughts."

Martin testified that, as of trial, he had not talked to any TSG staff members about returning to work with him again. He possibly intended to work as a sole proprietor and did not intend to create a new agency. He felt that some people in the community might consider him "tainted merchandise," meaning they would not trust him enough to hire him. He stated that he had a relatively small number of contacts in the Hawai'i advertising business because "[i]n Hawai'i it's a very small industry," not everyone believed he had a good reputation in advertising in Hawai'i, and there were some agencies "that would love for [him] to be out of the business."

On redirect examination, Martin testified that he was able to leave his former employer, Ogilvy & Mather (Ogilvy), to start TSG because 17 of 22 other Ogilvy employees decided to go with him and those employees brought their clients. The difference between working again after leaving Ogilvy and working again after TSG's bankruptcy was that Ogilvy had been a healthy company when he left, whereas TSG was not healthy when he declared bankruptcy.

### b. Janet's work prospects

Janet testified that after she and Martin separated, she looked for a job through employment agencies, but she was not familiar with software programs and could not take the computer proficiency tests at the agencies. She also sent out her resume to real estate employers for a few months. She did not have any work experience, business contacts, or business network in Los Angeles. She was not looking for a job at the time of trial.

Janet started investing online and was able to live off of her profits. Initially, she did very well investing in the tech industry, but in the two years prior to trial, she had been "decimated" by the market and some of the

stocks she invested in had lost 70%–80% of their value.

She testified that she was approaching an age in her life where she had to be careful and monitor herself because she was suffering from the onset of osteoporosis and had been told by her doctor that she was at high risk for multiple fractures and had to be careful of injuring her ankles, legs, wrists, and back. She stated that sometimes when she walked, her ankle "just [went] out" on her. She was exercising to build up her bone strength and taking medication.

Janet testified that she did not have sight in her left eye, which was artificial, and had temporal arteriolitis in her right eye, which could result in immediate blindness if she had a "head attack." She had to be very careful to avoid headaches. She testified that "[s]o far right now I'm fine." She also had a tear in her retina and a slight cataract, which impaired her vision in her right eye.

Janet testified that she had squamous cell carcinoma, the precursor to melanoma, when she left Hawai'i, and her doctor said she could have continuous squamous cell problems that would have to be biopsied; this was something she would have to monitor. She testified, "I can't be in the sun. . . . I mean, just being here [in Hawai'i] for three weeks, I can see how—how damaging it is to me." Janet stated that working as a realtor required driving a lot and showing properties, which constantly subjected her to sunshine that would not be conducive to her health.

She testified that considering her age and ailments, the only employment she would be qualified for would be sales clerk, but because of her ankles and legs, she could not stand while on the job. She had not applied for social security disability.

Janet testified that with regard to Martin's job prospects:

> [W]hen [Martin] quit Ogilvy and set up shop the next day, he already had a rental in place. He had all his employees in place. He had already contacted all of his important clients, and the next day he opened up [TSG].

This time I find it impossible to believe that he has this—this kind of problems financially and he doesn't have a plan. It's not in his—that's not the way he operates. I believe if anything he will collaborate, he will be a consultant with someone, he will be an individual consultant or a—but he has a plan.

She acknowledged that in Hawai'i, Martin was surrounded by his contacts and business associates and had name recognition.

### c. Result

■ Given the family court's "wide discretion in making its decisions," *Fisher*, 111 Hawai'i at 46, 137 P.3d at 360, and because "[i]t is axiomatic that reconciling conflicting testimony is beyond the scope of appellate review," *Onaka*, 112 Hawai'i at 384, 146 P.3d at 99, we hold that the family court in this case did not err in finding that Martin's prospects for work were greater than Janet's. FOFs 20 through 22, 25 through 30, 33, 34, 36, 49, 51 through 57, and 61 are not clearly erroneous and COL 5 is not wrong.

### 3. Wasting of marital assets

Martin contends he did not waste marital assets. Among other things, Martin argues: there was no credible evidence in the record that he *alone* lived extravagantly, the credible evidence showed that he needed his membership in private clubs to cultivate clients for his advertising business, he significantly reduced his standard of living, Janet did not affirmatively disagree with his giving Son and Daughter the amount of support he did, and he did not imprudently spend his portion of the proceeds from the sale of the Honua residence. Martin adds that Janet did not meet her burden of showing that the parties entered into a valid, oral marital agreement to equally split the proceeds from the sale of the Honua residence.

Martin also argues that the family court should have found that "Janet's fiscally irresponsible actions constitute 'wasting.'" Among other things, he argues that such "wasting" included Janet's moving to California and abandoning her successful real estate career; causing Son to move out of the Missouri residence and stop paying rent when

she moved into the residence; refusing to sell the Missouri residence; continuing to take unnecessary trips between California and New York; refusing to work in California or "contribute assets under her control"; and "leaving Martin with the sole responsibility for paying for virtually all expenses, all at a time when she knew (or should have known) that Martin's income was declining, that the parties' expenses were increasing, and that a financial crisis was coming."

Related to this point of error is Martin's claim that FOFs 10, 13 through 16, 18, 40 through 42, 72, 73, 75, 78 through 80, 88, 97 through 105, and 141 through 143 are clearly erroneous and COLs 20 through 23 are wrong. The FOFs provide:

10. Although both children are emancipated, [Martin] continued to use marital funds to provide for the two adult children during the 3 years since the date of separation. [Martin] was spending upwards of $3,500.00 per month on such unnecessary support for the adult children.

. . . .

13. [Janet's] current standard of living is much lower than when she lived in Hawaii.

14. [Janet] does not belong to any private clubs or a private golf club, drives a Nissan automobile, and has had to adjust her living expenses downward.

15. [Martin] kept his standard of living from the date of separation to the date of trial basically the same as his standard of living during the marriage.

16. [Martin] remains a member of both Waialae Country Club and Outrigger Canoe Club and owns a 1997 and 1983 Jaguar.

. . . .

18. This Court finds that maintaining such memberships while claiming to be on the verge of bankruptcy was unreasonable. [Martin] did not show a good faith effort to cut expenses by not terminating his membership with said institutions and finds his testimony in this area is not credible.

. . . .

40. [Martin] was using company funds to pay for his personal expenses and to pay for his non-dependant adult children's expenses of approximately $3,500 a month. [Ex BBB13, BBB14, BBB15, BBB17, BBB18]

41. This Court finds that [Martin] was unreasonably spending company money to cover these personal expenses.

42. There are [sic] no credible evidence presented by [Martin] as to why he used company funds to pay for his adult children's expenses rather than pay said funds to his creditors.

. . . .

72. [Martin's] company paid for [Martin's] memberships in Waialae Country Club, the Pacific Club, and the Outrigger Canoe Club. [Ex BBB13, BBB14, BBB15]

73. [Martin] also paid for his adult children's car insurance, bank loan payments, his grandson's school expenses, car leases, rent, and living expenses and his [Daughter's] rent, [Daughter's] monthly car lease and miscellaneous expenses, his [Son's] monthly rent and miscellaneous expenses at various times. These expenses were stated to be $2,900 a month in 2000, $3,510 a month in 2001, until July 27, 2001 on the Eve [sic] of trial. [Ex D, E, F, 2]

74. While paying these monthly expenses, [Martin's] Income and Expense Statement claimed he was making a mere $1,916.66 per month in income in 2001.

75. [Martin] did not adjust his lifestyle to fit his actual cash flow. [Martin] continued to maintain his extraordinary high standard of living and refused to tailor his spending to match his claimed financial situation.

76. Exhibit D is [Martin's] income expense statement dated and signed August 18, 2000. It reflects a monthly negative cash flow of $18,420.00 a month. Exhibit E is an income expense statement dated May 25, 2001 and Exhibit F is an income and expense statement dated May 30, 2001 and both reflect the identical negative cash flow of $16,088.38

a month. Exhibit 2 is the income and expense statement [Martin] submitted on July 27, 2001, on the eve of trial. It reflects a monthly negative of $9,738.38.

77. All four of [Martin's] income and expense statements respond to the question of who/what provides the funds to maintain the level of spending ind- ic[a]ted in the income and expense state [sic] with the following admission: "In the past I have taken money out from 401(k) plans. Now I am living on credit cards and checking account lines of cred- it." [Ex D, E, F, 2]

78. [Martin] began to borrow and with- draw funds from his retirement accounts in order to support his monthly negative spending for his and his children's living expenses.

79. [Martin] incurred significant personal charge card debts to support his life style and pay for his children's debts and living expenses.

80. [Janet] did not approve of [Martin's] spending.

. . . .

88. [Martin] both borrowed money and withdrew money from his Mass Mutual and Schwab retirement accounts in the amount of $463,581 from December 1998 through the year 2000.

. . . .

97. This Court finds that there was a marital agreement between the parties to divide the Honua Street property's sale proceeds between themselves on or about September 29, 2000.

98. By said marital agreement each party was to receive $210,753.24 of the pro- ceeds of the Honua Street sale. [Mar- tin] received an additional $19,000 as some form of reimbursement for repairs, for a total of $230,750.50 to [Martin]. [Janet] received $210,753.24. [Ex SS1]

99. The agreed upon disbursement of the Honua proceeds to each party was an advance to each party of part of their share of the marital assets in contempla- tion of the divorce.

100. This Court finds that the Honua Street sales proceeds, once they were distributed to each party pursuant to their marital agreement, became that party's Marital Separate Property.

101. This Court finds that [Martin] spent his share of the Honua Street house sale proceeds on himself or his adult children for various personal living expenses in less than one year, and further finds that these expenditures included, but were not limited to, the purchase of the lease on the 1997 Jaguar, payments made on behalf of the adult children, payments on loans owed by the adult married [Son], payments for adult [Daughter's] rent, payments for club membership and expenses for the adult children. [Martin] spent $172,512 of the Honua Street proceeds on himself and at least $58,238.50 of the proceeds directly on his adult children. [Ex 22]

102. [Janet] testified and this Court finds that [Janet] saved a large portion of her share of the Honua proceeds and the Paine Webber and Schwab One accounts contained said proceeds.

103. These are [VARCs] the Court has considered in arriving at its decision.

104. [Janet's] portion of the Honua Street sales proceeds should be segregated out of her Paine Webber and Schwab One accounts and awarded to her "off the top" as [Martin] has already received *and* spent his share of the Honua Street proceeds.

105. [Janet's] share of the Honua Street proceeds is to be credited to her as her Marital Separate Property.

. . . .

141. [Martin] testified that he used his credit cards for his living expenses.

142. Each party is to be responsible for their own individual debts and any and all debts that they incurred from Sep- tember, 1998, the date of separation. [Janet] is awarded the mortgage on the Missouri [Avenue] property. This allo- cation of debts is approximately equal for each party.

143. In the event there are any joint credit card debts, the party who *actually*

*incurred* the debt is to be responsible for payment of the debt.

COLs 20 through 23 provide:

20. [Martin's] liquidation of his retirement and IRA accounts was a negative contribution to the marital estate.

21. [Martin's] actions of continuing his life style and spending more than he earned to maintain his life style was a negative contribution to the marital estate.

22. [Martin's] spending of marital funds from the date of separation until the Date of the Completion of the Evidentiary Part of the Trial (DOCEPOT) on his adult non-dependant children was a negative contribution to the marital estate to the amounts that he spent on them during that period of time.

23. It is fair and equitable that [Martin] be assessed and imputed the negative contributions he made to the marital estate from the date of separation until the DOCEPOT.

In *Crosby v. State Department of Budget & Finance*, 76 Hawai'i 332, 340, 876 P.2d 1300, 1308 (1994), the Hawai'i Supreme Court held that a trial court's denomination of a FOF or a COL is not determinative of the standard of review to be applied on appeal. The supreme court went on to explain that

[a] determination that embraces an ultimate fact is a factual finding subject to the clearly erroneous standard of review even though classified as a COL. *Molokoa Village Dev. Co. v. Kauai Elec. Co.*, 60 Haw. 582, 596, 593 P.2d 375, 384 (1979); *see also Coll v. McCarthy*, 72 Haw. 20, 28, 804 P.2d 881, 886 (1991) (noting that mixed questions of fact and law are reviewed under the clearly erroneous standard).

*Id.*

FOFs 142 and 143 are actually mislabeled COLs, and we will review them according to the right/wrong standard of review.

### a. Martin's wasting

### i. Martin's testimony

Martin testified that he had been supporting Son and Daughter, stating that "I guess you can say that I was overly helpful to my children." At the time of trial, he was paying for his children's and daughter-in-law's psychiatry bills. He had paid for Daughter's college tuition and room and board when she was in school. Martin had also paid Daughter's rent in California while she was earning $750/year working as an AmeriCorps volunteer. He was paying the lease on her car. At the time of trial, Daughter was living in Hawai'i, enrolled in two college internet classes, and was working at a restaurant, and Martin was still paying for everything.

Martin had helped pay Son's creditors, so that Son would have a good credit rating. Son was a "dot commer" who had a good job, but not a college degree. Son had been divorced recently. Martin paid for preschool for his grandson because he did not want Son's former wife, the mother of the grandson, to have to work part time. He had also paid Son's legal bills stemming from a "DUI."

Martin paid "a lot more than" $1,760 a month in expenses for Son and Daughter, but he hoped to start paying that amount from the time of trial on, "if [Daughter] can get on her own and [Son] can get on his own." On cross-examination, Martin testified that as of August 2000 he was paying $3,500 a month on Son and Daughter's expenses and that his children were adults, but not emancipated in the sense that Son had been in and out of work and Daughter was still in college.

At the time of trial, Martin was renting a Hawai'i Kai residence, where Daughter and he were residing, but he was actually living in Waikiki with a lady and not paying the lady "for anything." He paid for a gardener's services and $350 a month for utilities at the Hawai'i Kai residence.

Martin had kept his 1983 Jaguar in case Daughter needed it when the lease on her car expired. He was paying for insurance on Janet's, Daughter's, and Son's respective cars, as well as his own cars.

Martin and Janet had engaged in ongoing discussions and arguments about assisting Son and Daughter financially. Martin testified that when he asked Janet, "What do we do, put the kids out in the street[?]," Janet

told him, "[n]o, we're not going to do that" and "[y]ou work it out." He believed he was using his and Janet's "collective resources" to help Son and Daughter financially.

Martin testified that he, Janet, Son, and Daughter made extensive charges for personal expenses on credit cards issued to TSG. He stated that "to be honest, we both [Martin and Janet] abused those charge cards."

Martin had resigned as a member of Oahu Country Club "a number of years" prior to trial. He first testified that he had put his Waialae Country Club and Pacific Club memberships on inactive status because TSG could not afford to pay for them. He later testified that he had reinstated his memberships in January 2001 because "those clubs are social clubs, business clubs; but it's also something that is needed in my business." Martin reinstated his memberships at a time when he had a $9,000 a month deficit. He had retained his membership at the Outrigger Canoe Club so that he could host an annual lunch put on by one of his clients and because it "was sort of like [his] therapy" to go there. Martin had maintained his memberships to "stay in contact with clients" and to have places "to take new business prospects."

When asked about information reflected in his tax returns, Martin stated numerous times that his accountant, Addie Lamberth (Lamberth), would be better able to answer those questions.

Martin took an advance from TSG in 1998 for $101,000 for personal and living expenses, which "encompass[ed] his family," and two advances in 2001 for $19,000 and $4,000. He did not include those advances on his Income and Expense Statement because he "didn't think about it."

Martin testified that he spent the proceeds from the sale of the Honua residence as follows: $26,000 to buy the 1997 Jaguar he had been leasing (he conceded he would have saved money if, rather than buying out the lease on the 1997 Jaguar, he had let it go, bought out the lease on Daughter's car, and drove his 1983 Jaguar); $4,335 to pay off loans TSG owed Mass Mutual (loans he used to pay his living expenses and credit card debt); $4,700 on his AT&T VISA card for his personal charges; storage expenses for his and Janet's personal household effects; a total of $45,600 toward two Amex line-of-credit checking accounts used for his personal expenses; $32,000 to pay back a line of credit TSG had with Wells Fargo Bank (which funds had been used for his personal living expenses); moving expenses from the Honua residence to the Hawai'i Kai house and rent for the house; personal insurance; $2,450 in charitable donations; payments on his Advanta VISA card, his Mastercard, his Amex revolving checking account, and Amex Platinum cards for Son, Daughter, and himself; $2,100 towards his overdraft protection on a Bank of Hawai'i (BOH) account; $53,973.50 for Son's expenses; and "a lot more" than $4,265 on Daughter.

Martin testified that he probably was currently paying out the $9,738.38 per month deficit he indicated in his Income and Expense Statement. He acquired the money by "float[ing] around charge cards" and opening lines of credit. He took a $23,000 advance from TSG and got a personal bank loan. He was paying off a $40,000 overdraft debt with BOH that had been incurred for family expenses.

He testified that if he did not have debts, he would be able to save $36,000 to $40,000 a year.

### ii. Janet's testimony

Janet testified that Son was a computer network programmer, currently making $70,000 a year. Prior to his current job, Son had quit a job at Amgen where he made $50,000–$55,000 a year; prior to Amgen, Son had worked at Sun America, making $100,000–$125,000 a year. Daughter was not in college, but had taken one course on the internet, and Daughter was applying for an airline job. Janet stated that Martin encouraged Daughter to take public service jobs and offered always to pay for her expenses so she could do so.

When Daughter's car was stolen, Martin wanted to buy Daughter a new car rather than letting Daughter use the $12,000 from her insurance reimbursement to buy a used car. Janet talked Martin into leasing a car

instead. Janet believed Daughter should get a loan to pay for the car, rather than Martin continuing to pay for the lease.

Janet continually had been against Martin's providing for Son and Daughter financially and had asked him to stop doing so for years. However, she testified, Martin was controlling and dominating and "could make life very miserable" if you "bucked" him. Janet discovered the extent of Martin's expenditures on their children when she moved to the Missouri residence and found a box with receipts for bills he had paid.

Daughter was not living in the Hawai'i Kai house that Martin had rented for Daughter and him, and Martin had promised Daughter he would pay $1,500 toward her rent when she got her own place, which she was going to do. Janet stated that Martin's girlfriend drove the 1997 Jaguar and Martin drove the 1983 Jaguar.

Janet testified that she had not incurred any of the debt on Martin's credit cards or the $40,000 BOH debt. However, Martin had been paying the insurance on her car.

After looking at Martin's private club charges for the last two years, Janet noted that Martin had 21 meals one month at the Outrigger, had charged over $500 every month in 2001 at the Waialae Country Club, and had used the Pacific Club frequently in 2001 and eaten there at least four times a month with someone. She thought all of these charges were paid by TSG.

Janet testified that she believed Martin's spending $53,000 to $54,000 of his Honua residence proceeds on the children was wasting assets.

### iii. Result

■ Given the family court's "wide discretion in making its decisions," *Fisher*, 111 Hawai'i at 46, 137 P.3d at 360, and because "it is axiomatic that reconciling conflicting testimony is beyond the scope of appellate review," *Onaka*, 112 Hawai'i at 384, 146 P.3d at 99, we hold that the family court in this case did not err in finding that Martin wasted the marital assets. FOFs 10, 15, 16, 18, 40 through 42, 72, 73, 75, 78, 79, 88, 97 through 105, and 141 are not clearly errone-

ous and COLs 20 through 23 and mislabeled FOFs 142 and 143 are not wrong.

### b. Janet's wasting of marital assets

Martin alleges that Janet's fiscally irresponsible actions constituted "wasting."

### i. Martin's testimony

Martin testified that Janet moved to California because she no longer liked Hawai'i, had family on the Mainland, and no longer wanted to work. At that time, there was a downturn in the real estate market.

It was Janet's idea to buy the Missouri residence because she wanted to have a place to stay in while she cared for her mother, who lived in California. Initially, Son and his wife lived in the house, and Janet would stay there when she visited; but there was an incident between Son and his wife and Janet, and Son and his wife moved out. Martin suggested to Janet that they sell the house because they could not afford it, but Janet wanted to keep it. Martin continued to pay the mortgage, taxes, and "everything" on the Missouri residence, even though he could not afford it.

### ii. Janet's testimony

Janet testified that she moved to California after living in a loveless marriage with Martin for "many, many years." She did not want a divorce, but after the couple's attempt at marriage counseling failed and their relationship further deteriorated, she moved out of the Honua residence.

When Janet was living in the Missouri residence in 1999, Martin paid the expenses for the property. At the time of trial, Janet was paying almost $2,500 a month in expenses related to the Missouri residence, such as the mortgage, maintenance, taxes, etc. She was living off of the profits she made from the sale of the Honua residence.

When asked on cross-examination whether she had been to New York quite frequently in the several years prior to trial, Janet responded, "I have a sister and brother-in-law that live there. I have friends there. I also have two eye doctors that I've been

seeing since 1980." She also testified that she had a boyfriend in New York.

### iii. Result

■ Again, given the family court's "wide discretion in making its decisions," *Fisher*, 111 Hawai'i at 46, 137 P.3d at 360, and since "it is axiomatic that reconciling conflicting testimony is beyond the scope of appellate review," *Onaka*, 112 Hawai'i at 384, 146 P.3d at 99, we hold that the family court in this case did not err in finding that Janet did not waste the marital assets. FOFs 13, 14, and 80 are not clearly erroneous and the mislabeled FOFs 142 and 143 are not wrong.

### 4. Credit for withdrawals from retirement accounts

Martin argues that he should not be credited with the money he took out of his retirement accounts to pay for the parties' various expenses because his withdrawals and borrowings were necessary and justified. Related to this argument is Martin's claim that FOFs 78, 84 through 86, 88 through 92, 94, and 96 are clearly erroneous and COLs 7 through 9, 12, 20, and 28 are wrong.

The relevant FOFs provide:

78. [Martin] began to borrow and withdraw funds from his retirement accounts in order to support his monthly negative spending for his and his children's living expenses.

. . . .

84. Further, [Martin] withdrew $325,044 from his [M]ass Mutual retirement account [Ex BB1, p24] and another $44,038 from his Schwab IRA for a total of $369,082 in 1999. [Ex TT1, p10]

85. In 2000, [Martin] withdrew yet another $44,004 from his Mass Mutual retirement account [Ex BB1, p9] and another $10,555 from his Schwab account. [Ex BB2, p11]

86. In 2000 the total [Martin] withdrew from his IRAs was $54,559.

. . . .

88. [Martin] both borrowed money and withdrew money from his Mass Mutual and Schwab retirement accounts in the amount of $463,581 from December 1998 through the year 2000.

89. After the parties' date of separation in September, 1998, [Martin] unilaterally reduced his retirement and IRA accounts by $463,581.

90. [Janet] did not approve of the liquidation of [Martin's] retirement and IRA accounts.

91. The retirement and IRA monies were liquidated by [Martin] for his personal use and benefit and for payments for his children's and grandson's expenses.

92. There was also testimony that [Martin] withdrew funds from his retirement accounts to pay back $174,000 in advances he received from his company, paid the taxes said withdrawals incurred, leaving another $59,000 unaccounted for. [Martin] failed to adequately explain to the Court's satisfaction how all of the retirement and IRA funds were spent. [Ex 23]

. . . .

94. This Court finds that the liquidation of the retirement and IRA accounts was a negative contribution to the marital estate.

. . . .

96. The aggregate amount of retirement and IRA funds that [Martin] liquidated from the date of separation to the date of the trial is imputed to him and is to be credited to him with an appropriate offset to [Janet] of a similar amount.

FOF 96 is actually a mislabeled COL, and we will review it according to the right/wrong standard.

The relevant COLs provide:

7. This Court further concludes that [Martin] was a constructive trustee of the retirement and IRA funds while [Janet] was the marital beneficiary of said retirement and IRA funds and had a marital interest in the funds.

8. The unilateral liquidation and utilization by [Martin] of the retirement and IRA funds resulted in financial detriment to both the marital estate and [Janet], and are [VARCs].

9. This Court concludes that the evidence proves that [Martin] used the retirement funds to pay for living expenses for himself and for his two adult non-dependent children and some educational expenses for his grandson, to the detriment of [Janet] and the marital estate.

. . . .

12. This Court concludes that it is equitable that [Martin] be awarded his interest in his remaining IRA retirement funds and be imputed and credited with the $463,581 that he liquidated from his various IRA and retirement accounts. Accordingly, [Janet] is awarded a corresponding amount from her SEP and IRA accounts.

. . . .

20. [Martin's] liquidation of his retirement and IRA accounts was a negative contribution to the marital estate.

. . . .

28. This Court finds that it is equitable and just that [Martin] be imputed and credited with the amount that he liquidated from his retirement and IRA accounts with an offset to [Janet].

At trial, Martin testified that the IRA proceeds he received in 1999 and 2000 went to paying bills and taxes. Martin stated that he withdrew $369,000 from his IRA in 1999 for "the upkeep of the Schiller household." The Honua residence cost about $120,000 a year and the Missouri residence cost about $3,000 a month. The money also went to pay taxes. He testified that he had paid all of his and Janet's state and federal taxes for all but maybe one or two years since 1969 when they married, although "there may have been some other times that [Janet] gave a little bit." He also used some of the money for Son's DUI legal bills. Martin stated that he had sought other sources of funds before withdrawing money from his IRA.

Janet testified that she never signed off on and was never contacted about Martin's withdrawal of $325,000 in 1999 from the Mass Mutual fund. She stated that Martin withdrew the $369,000 from his retirement in 1999 before he served her with divorce pa-

pers in 2000 and the $369,000 should therefore be credited to Martin.

Again, given the family court's "wide discretion in making its decisions," *Fisher*, 111 Hawai'i at 46, 137 P.3d at 360, and since "it is axiomatic that reconciling conflicting testimony is beyond the scope of appellate review," *Onaka*, 112 Hawai'i at 384, 146 P.3d at 99, we hold that the family court in this case did not err in finding that Martin should be credited with the money he took out of his retirement funds. FOFs 78, 84 through 86, 88 through 92, and 94 are not clearly erroneous; and mislabeled FOF 96 and properly labeled COLs 7 through 9, 12, 20, and 28 are not wrong.

### 5. Filing for bankruptcy

Martin maintains that he filed the TSG bankruptcy for purely financial reasons and not to gain an advantage in the divorce. Related to this argument is Martin's contention that FOFs 45 through 48 are clearly erroneous and COL 19 is wrong. Martin asserts that although the family court does not state in its findings that he filed for bankruptcy to gain an advantage in the divorce proceedings, the court clearly considered this alleged plan when deviating from the Marital Partnership Principles.

FOFs 45 through 48 provide:

45. At one point [Martin] stated that the filing of a complaint by a creditor for a debt caused him to file for bankruptcy protection. However, the complaint was for only $13,175 against The Schiller Group, Ltd. [Ex 45]

46. Yet [Martin] also testified that the filing of the bankruptcy petition was a "split second decision."

47. [Janet] testified that [Martin] filed corporate bankruptcy on the eve of trial to gain a trial advantage.

48. [Martin's] testimony as to why he filed for corporate bankruptcy lacks credibility.

COL 19 provides:

19. The credibility of the parties during the trial is a [VARC] for the Court. [Martin] was not credible in his disclosures in his various income and expense

statements and asset and debt statements, in his testimony regarding why he filed for corporate bankruptcy, his professed ignorance as to the circumstances surrounding his purchase of [Garnet], and his professed ignorance as to what a K–1 form was.

At trial, Martin testified that "the bankruptcy happened literally on a moment's notice." Then, in response to the question, "[I]sn't it true that you … had been contemplating bankruptcy for quite some time?", Martin responded, "If you go back to February of 2000, my accountant Addie finally convinced me I had to do something. So we met with the creditors … [a]nd I submitted a plan to them which I guess is … an out-of-court Chapter 11." He further testified:

> Some time ago, … my attorney said, Marty, you don't have to declare bankruptcy, but I think you ought to prepare for it…. Don't wait until the last minute because it takes some time to do this.
>
> So we prepared all the papers. I had some casual conversations with some people on the staff and just sort of sat—sat there.
>
> . . . .
>
> I said [to my attorney] … I don't want to declare bankruptcy. I don't want it on my resume. I would prefer to do what needs to be done to pay what I think is right.
>
> . . . .
>
> So we got a … final offer from WOR [Radio] [one of TSG's creditors] which said, Pay us 50 cents on the dollar immediately.
>
> I could not break the trust of the other 57 [creditors] that had agreed to 22 cents on the dollar because, one, you can't work in this town after you lose trust with these people and, two, I couldn't do anything with one creditor as opposed to another so the decision was to go into bankruptcy.
>
> I found out the day before because I got a call from a gentleman who said he was a mediator…. And [Travel Agent Magazine] had filed … for suit. They were one of the 57 creditors that agreed to the plan.

> And when I found that out, I said … this is a domino effect. So we made the decision … to go ahead and do it, and we filed it [a bankruptcy petition] immediately.

Martin testified that the timing of his bankruptcy filing, one week before trial, had nothing to do with the divorce proceedings. He did not know exactly when the bankruptcy petition had been prepared because his attorney "typed it up." Martin testified that "it all just came down over the last week or so."

Martin stated that he declared bankruptcy because he lost some good employees and some clients decided to leave the agency, creating a domino effect. Martin speculated in his testimony that clients may have left his agency because of the state of the economy at the time. He believed he lost one potential client because someone told the client that TSG was having financial problems.

With regard to the timing of Martin's filing for bankruptcy, Janet testified:

> I found it calculating and deliberate that he has staved off all these creditors for all these months, 18 months. And all of a sudden a few days before we go to court for our divorce, he somehow gets a … $12,000 lawsuit, can't seem to pay it.
>
> However, he has taken thousands of dollars over the past months for other expenses, but he can't do anything about this. He can't break the trust. He couldn't pay that off so he goes into bankruptcy. I find it devious. And I know he has a plan.

Again, given the family court's "wide discretion in making its decisions," *Fisher*, 111 Hawai'i at 46, 137 P.3d at 360, and since "it is axiomatic that reconciling conflicting testimony is beyond the scope of appellate review," *Onaka*, 112 Hawai'i at 384, 146 P.3d at 99, we hold that the family court in this case did not err in finding that Martin filed for bankruptcy to gain an advantage in the divorce. FOF 48 is not clearly erroneous and COL 19 is not wrong. FOFs 45 through 47 are not clearly erroneous because they are supported by evidence in the record on appeal.

### 6. Martin's inheritance

Martin contends the family court improperly considered his purely speculative inheritance as a VARC when dividing the marital property. Related to this argument is Martin's contention that FOF 117 is clearly erroneous. FOF 117 provides:

117. [Martin] stands in line to inherit properties from his Mother. The values of the properties were estimated to be around 3 million dollars by [Janet] who is personally familiar with many of the properties.

Martin argues that there is no evidence showing that he would "inherit anything from his mother, much less a massive amount like $3,000,000." He adds that "the record contains *nothing* to suggest that [Martin's] mother's properties are worth $3,000,000. In fact, the record is devoid of any estimates whatsoever concerning his mother's property holdings."

Martin argues that even if the family court found that he was an heir to his mother's estate, "the court may not consider this fact when dividing the parties' property. The possibility of [Martin] actually receiving any of her property is simply too speculative and uncertain."

At trial, when Janet's attorney began questioning Martin about his expected inheritance from his mother, Martin's attorney objected on the basis that there was no foundation for the testimony and the testimony would not be relevant because "whatever [Martin] might receive in the future is speculative." The family court allowed the testimony over the objection, to "allow some latitude into this area."

When asked on cross-examination whether his mother had indicated any intent to convey to Martin any part of her 20% remaining interest in Garnet, Martin responded that she told him she was "considering giving everything that she has to the great grandchildren."

Janet testified that she was like a daughter to Martin's mother, and Janet knew that Martin and his brother were the sole heirs to Martin's mother's estate. When Janet began testifying as to what real estate Martin's mother owned, Martin's attorney objected that the testimony was speculative and there was no foundation for an irrevocable trust mandating that some property go to Martin. However, the family court allowed the line of inquiry and stated that it would "give it what weight the Court deems necessary." When Janet's attorney asked her to estimate the values of the properties, Martin's attorney objected on the basis that Janet was not competent to render such an opinion. Janet's attorney attempted to lay a foundation for her competence to evaluate the properties, but, after several objections, abandoned his efforts.

Whether a family court can consider a party's expectancy under the will of a living parent in making an equitable distribution of property and debts upon divorce appears to be a case of first impression in this jurisdiction. In other jurisdictions, there is a split of authority on this issue. *See, e.g., In re Marriage of Benz,* 165 Ill.App.3d 273, 287, 518 N.E.2d 1316, 1324, 116 Ill.Dec. 336, 344 (1988) (holding that "there is generally no error where a court [in dissolution action] considers a future or anticipated inheritance when distributing property"), and *In re Marriage of Dalley,* 232 Mont. 235, 239–40, 756 P.2d 1131, 1133 (1988) (holding that the lower court did not abuse its discretion by considering that wife would shortly receive a substantial inheritance when dividing the parties' assets); *but see, e.g., Parker v. Parker,* 929 So.2d 940, 946 (Miss.App.Ct.2005) (holding that an expectancy of inheritance is not an asset for equitable distribution purposes); *E.H. v. S.H.,* 59 Mass.App.Ct. 593, 597 n. 7, 797 N.E.2d 411, 414 n. 7 (2003) (holding that "a future inheritance is a mere expectancy and so is not included in a property division" on divorce); *Hacker v. Hacker,* 659 N.E.2d 1104, 1112–13 (Ind.App.Ct.1995) (holding that the lower court abused its discretion by considering husband's potential inheritance in dividing marital assets); *Johnston v. Johnston,* 249 Mont. 298, 304, 815 P.2d 1145, 1148 (1991) (holding that district court properly disregarded wife's speculative future inheritance from father in apportioning marital estate); *Cich v. Cich,* 428 N.W.2d 446, 449 (Minn.App.Ct.1988) (holding that trial court

committed clear error in dividing marital property based on the possibility of husband's future inheritance); *Rubin v. Rubin*, 204 Conn. 224, 237, 527 A.2d 1184, 1190–91 (1987) (approving "the view of those courts that have held evidence of a possible future inheritance to be inadmissible for the purpose of a property assignment or alimony award"); *Davidson v. Davidson*, 19 Mass. App.Ct. 364, 374, 474 N.E.2d 1137, 1145 (1985) (holding that trial court, in dividing marital property, could not consider husband's expectancy under his mother's will where mother was alive at time of divorce and could have changed her will); and *In re Marriage of Stephenson*, 121 Ill.App.3d 698, 699, 460 N.E.2d 1, 2, 77 Ill.Dec. 142, 143 (1984) (holding that trial court, when dividing marital property, properly refused to consider evidence concerning wife's potential inheritance from her mother).

■■■ We believe that inheritances a spouse expects to acquire after divorce "are speculative, because the testator is free to change his will at any point in the future. Like other speculative assets which do not constitute *property*, they are not part of the divisible estate." 1 Brett R. Turner, *Equitable Distribution of Property* § 5:47 (3d ed.2005) (footnote omitted). Further, "[a] court cannot divide property which the parties do not own at the time of its decree although they may acquire it later on. Thus, in a jurisdiction where inherited property may be divided by the court in divorce proceedings, no distribution of an expectancy in an inheritance can be made." 24 Am.Jur.2d *Divorce and Separation* § 515 (1998) (footnotes omitted).

In *Hussey v. Hussey*, 77 Hawai'i 202, 207, 881 P.2d 1270, 1275 (App.1994), *overruled on other grounds by State v. Gonsales*, 91 Hawai'i 446, 984 P.2d 1272 (App.1999), this court included in the category of marital separate property "[a]ll property that (1) was acquired by the spouse-owner *during* the marriage by gift or inheritance." (Emphasis added.) We infer from the inclusion of the word "during" that the supreme court specifically intended to exclude from the category of marital sepa-

rate property an inheritance interest that does not vest during the marriage.

We hold that the family court erred in considering any inheritance Martin may have been expecting from his mother, who was living at the time of trial, in dividing and distributing the property and debts of the parties.

Further, FOF 117 is clearly erroneous because there is no evidence in the record on appeal that Martin expected to inherit properties worth $3,000,000 from his mother.

### 7. Parties' relative conditions upon division of marital estate

■■■ Martin contends the family court violated Hawaii Revised Statutes (HRS) § 580–47 (2006 Repl.) by failing to look at the condition Martin would be left in after awarding Janet $916,960.72 in net assets and leaving Martin with a negative net worth. Martin argues that the family court should have "ordered Janet to make an equalization payment of $589,437.11, which would leave each party with equal assets of $327,573.61[.]"

HRS § 580–47(a) provides in relevant part that "the court shall take into consideration ... the condition in which each party will be left by the divorce."

As we have already discussed, in the instant case the family court determined that there were "[VARCs] authorizing a deviation from the Partnership Model Division." *Jackson*, 84 Hawai'i at 332, 933 P.2d at 1366. Further, the family court's extensive FOFs clearly show that in dividing and distributing Janet and Martin's assets and debts, the court took into consideration the conditions each would be in after their divorce.

### C. Garnet

Martin argues that his interest in Garnet is his marital separate property, not subject to equitable distribution. Martin argues, in the alternative, that even if the family court was correct that Garnet was not marital separate property, the court nevertheless erred in classifying it as a Category 5 property, when it would be a Category 3 property.

Related to this point of error is Martin's claim that FOF 131 is clearly erroneous and COL 26 is wrong. FOF 131 provides:

> 131. After reviewing all the evidence and considering all relevant testimony, this Court finds that [Garnet] is Category 5 Marital Partnership Property.

FOF 131 is actually a mislabeled COL, and we will review it according to the "right/wrong" standard.

COL 26 provides:

> 26. This Court finds that [Martin] purchased his 40% interest in [Garnet] during the marriage. [Martin's] interest in [Garnet] is category 5 marital partnership property.

At trial, Martin testified that he did not know or care what his interest in Garnet was worth, he knew very little about the partnership or the gift arrangement to him, and his accountant knew more about the arrangement than he did. However, he did state that he knew he owned 40% of Garnet.

Martin's attorney stated that Plaintiff's Exhibit 12 was a promissory note (Note) indicating that Martin owed his mother $126,000 plus interest at 7.6% that had accrued since December 30, 1994, for Garnet. Martin testified that he did not know whether he owed that much to his mother and he had not made any payments under the Note. He stated that each year his mother forgave $10,000 of the amount he owed on the loan as a gift to him as part of her estate plan. Martin had signed paperwork for his mother's estate planning, but he actually did not know whether he had signed the Note.

Martin testified that he had co-signed a loan, for which Garnet was security, with Hawaii National Bank, but he did not know how the loan was paid off and only saw the balance sheets for the loan when Janet's attorney subpoenaed them.

Martin testified on cross-examination that in his Income and Expense Statement, he had assigned Garnet an estimated value of $168,875. He also testified that he had "[a]bsolutely no idea" how much Garnet was worth. When asked whether he had ever received an accounting from his mother or anyone on her behalf as to how much Martin

was owed under the Note, Martin responded, "All I do is get a K–1. And I don't even … look at the K–1. Matter of fact, the last year my accountant I think got the K–1 directly from somebody because I didn't have it."

Lamberth testified that she had prepared the parties' tax returns from 1993 to 1998 and Martin's tax returns for 1999 and 2000. In each year since 1995, a K–1 for the Garnet Partnership had been included in Martin's personal tax returns. Lamberth did not have anything to do with the preparation of the K–1; rather, a copy of it was sent to her and she put the information in Martin's tax return.

Martin testified that he had worked "in varying degrees from account executives to an owner of an agency" in the 33 years that he lived in Hawai'i and he had owned TSG for eight years.

Janet testified that she had signed an Interspousal Transfer Grant Deed so Martin's mother could get a loan to finance Garnet. Janet had seen one or two of the K–1s generated for Garnet and the K–1s showed an income for income tax liability purposes. She agreed with an appraiser that Garnet's value was between $650,000 and $675,000.

Martin argues that his interest in Garnet is his marital separate property, not subject to equitable distribution.

In an asset and debt statement submitted as Defendant's Exhibit C in evidence, Martin explained the following with regard to Garnet:

> 1/ This 40% partnership interest is the result of a series of gifts from my mother, including $10,000 in 1994 when she sold me the 40% interest for **$136,000**. She forgave the first $10,000 of the purchase price as a 1994 gift. The balance of the purchase price was $126,000, payable under the terms of an installment note from me to her, together with interest computed at 7.6% per annum. I have never made any payments under that note, and my mother has made seven (7) annual $10,000 gifts to me in the form of forgiving that amount each year on my obligation to her under the note. Applying each of those gifts first to interest then due and the balance to

principal[,] I believe I still owe about $110,610 on this note. The present value of $152,003 is taken from the most recent partnership K–1 statement (2000). I do not know what the "actual" fair market value of my interest may be.

(Emphasis in original.)

 In *Hussey*, 77 Hawai'i at 207, 881 P.2d at 1275, this court explained that marital separate property included "[a]ll property that (1) was acquired by the spouse-owner during the marriage by gift or inheritance, (2) was expressly classified by the donee/heir-spouse-owner as his or her separate property, and (3) after acquisition, was maintained by itself and/or sources other than one or both of the spouses and funded by sources other than marital partnership income or property."

The issue in the instant case is whether Martin's mother's yearly "gifts" of forgiving $10,000 of the amount owed on the Note made Garnet itself a gift to Martin and, hence, Martin's separate property, or whether, notwithstanding her estate planning device, Martin's mother actually sold Garnet to Martin, making it marital partnership property.

The evidence in the record on appeal shows that Martin's mother purported to sell Martin his interest in Garnet merely as an estate planning tactic and that she would have given Martin a 40% interest in Garnet outright if doing so would not have had adverse tax consequences. No evidence was presented that Martin's mother did not intend to continue giving Martin gifts up to the annual exclusion amount each year by forgiving part of the balance owed; presumably, she planned to continue giving him such throughout her lifetime until the balance was eliminated altogether.

Further, a "Grant Deed" (Plaintiff's Exhibit 12 in evidence) shows that on December 29, 1994, Martin's mother granted Martin an undivided 40% interest in Garnet. Her act of deeding Garnet to Martin before he paid in full is further evidence that Garnet was a gift.

With respect to the second requirement put forth in *Hussey*, as Martin argues in his opening brief, "the 'Grant Deed' by which [Martin's] mother gave [Martin] his Garnet interest characterized Garnet 'as [Martin's] *sole and separate property*[.]' (Pl. Ex. 12, p. 18)." (Emphasis in original.)

Regarding the third requirement in *Hussey*, Martin testified that he had not made any payments to his mother for Garnet and was not involved with Garnet or the partnership. Janet testified that Martin's mother got the income from Garnet, Martin's brother was the trustee, and Martin's brother had everything of their mother's on his computer.

Although Martin's mother structured it as a sale and benefitted from characterizing it a sale for tax-saving purposes, Martin's 40% interest in Garnet was a gift—hence Martin's separate property.

Even though Garnet was Martin's separate marital property, there is a contradiction in the case law in this jurisdiction regarding whether a family court can award separate property to a non-owner spouse. In *Markham v. Markham*, 80 Hawai'i 274, 909 P.2d 602 (App.1996), this court stated:

Under the partnership model, absent an agreement to the contrary, each partner is entitled to his or her separately owned property.... HRS § 580–47(a), however, vests the family court with broad discretion to divide and distribute the estate of the parties whether community, joint or *separate* in a just and equitable manner. (Emphasis added.) *This discretion encompasses the authority to award separate property to the non-owning spouse.*

*Id.* at 286, 909 P.2d at 614 (internal quotation marks and citations omitted; emphasis in original and added).

However, in *Hussey*, this court stated:

Although *Marital Separate Property cannot be used by the family court to "offset,"* [*Tougas*, 76 Hawai'i] at 32, 868 P.2d at 450, *the award of Marital Partnership Property to the other spouse,* it can be used by the family court to "alter the ultimate distribution of Marital Partnership Property based on the respective separate conditions of the spouses." *Id.* at 32, 868 P.2d at 450. *In other words, Marital Separate Property is property that has*

*been validly excluded from the marital partnership.* Although *the family court* may allow Marital Separate Property to reasonably influence the division and distribution of Marital Partnership Property, it *cannot award any Marital Separate Property to the non-owner spouse.*

77 Hawai'i at 207, 881 P.2d at 1275 (ellipsis and brackets in original omitted; emphases added). We believe that in *Hussey,* this court's paraphrasing of the holding in *Tougas* was inaccurate and that *Markham* controls in this case.

In *Tougas,* the parents (Parents) of Carol Tougas (Carol) created a partnership as part of their estate plan to provide exclusively for their children. 76 Hawai'i at 23, 868 P.2d at 441. Parents lived in California. *Id.* Parents conditioned the creation of the partnership on the understanding that it would benefit their three children to the exclusion of their children's spouses or significant others. *Id.* Carol's husband (Raymond) and Carol's sibling's spouses all entered into a "spousal consent" form, stating that the spouses were to have no interest in the proceeds of the partnership and acknowledging that the partnership was separate property, inaccessible during a divorce action. *Id.*

Parents formed a second partnership, although no "spousal consent" forms were signed with regard to it. *Id.* Again, Parents intended to limit the proceeds of that partnership to benefit only their children. *Id.*

During Carol and Raymond's divorce proceedings, the family court determined that the "spousal consent" agreement was not enforceable as a contract. *Id.* at 24, 868 P.2d at 442. After Parents filed suit in California to protect the confidentiality of the partnership agreements, the California Superior Court (superior court) determined, among other things, that the "spousal consent" agreement was a valid contract and that therein Raymond "gave up any interest, claim, or benefit from [Carol's] interest in the . . . partnerships and any property interest conveyed by [Parents] to [Carol]." *Id.* at 25, 868 P.2d at 443. Specifically, the superior court concluded that Raymond "was not to benefit, now or in the future, by way of set off or otherwise relating to child support,

spousal support, or division and distribution of property and debts in the Hawai'i divorce action." *Id.*

The Hawai'i family court ordered the superior court's "judgment to be given 'full faith and credit' and that 'it shall be the law of the case.'" *Id.* The family court later issued a supplemental order reaffirming the previous order, but concluding that the Hawai'i family court would be able to consider Carol's "separate property holdings in *assessing* the condition that the parties would be left in following the divorce." *Id.* (emphasis in original). The family court also "declared that [Carol's] separate property partnership interests would be relevant in determining an appropriate child support award and whether or not alimony was awardable." *Id.* (footnote omitted).

Following trial, the family court decreed, among other things, that Raymond was not entitled to any share of Carol's interest in the two partnerships and that Carol was awarded 25% of the post-marital value of PDI, Raymond and Carol's business. *Id.*

Both Carol and Raymond appealed the family court's decree. *Id.* On appeal, Carol argued, among other things, "that because the court determined that both she and [Raymond] contributed as equal partners to the formation and operation of PDI, she should be allotted fifty percent, and not twenty-five percent, of the business." *Id.* at 32, 868 P.2d at 450. This court stated that the family court's

actions in distributing the estate are discretionary, based on what the court deems to be just and equitable under the circumstances. Moreover, because the applicable statute, HRS § 580-47, allows the court to consider the condition of the parties after the divorce, separate property holdings may properly factor into the court's consideration. This does not mean, however, that [Carol's] partnership interests should offset [Raymond's] interest in the marital estate. The validation of the spousal consent agreement, which operates as a waiver by [Raymond] of all rights to the partnerships, conclusively establishes the contrary. The court may,

nevertheless, alter alimony, child support and, as in this case, the ultimate distribution of the marital estate based on the respective separate conditions of the spouses.

*Id.*

In *Tougas,* rather than making a blanket statement that the family court "cannot award any Marital Separate Property to the non-owner spouse" in any case, this court narrowly held that where Carol and Raymond had entered into a valid contract whereby Raymond agreed to waive any rights to Carol's interest in her parents' partnerships, Carol's partnership interests should not offset Raymond's interest in the marital estate.

Under the holding in *Markham,* 80 Hawai'i at 286, 909 P.2d at 614, the family court may "award separate property to the non-owning spouse." In the instant case, although Martin's interest in Garnet was separate property, the family court treated it as marital property, not separate property. Therefore, FOF 131 is erroneous and COL 26 is wrong.

### D. Failure to argue FOFs/COLs

Martin contends in his points of error that FOFs 17, 19, 24, 39, 50, 58 through 60, 64, 69, 70, 95, 114, 120 through 122, 124, 125, 128 through 130, 132, and 135 are erroneous and COLs 3, 6, 10, 13 through 18, 25, 27, and 29 are wrong, but he does not actually argue these points in his opening brief and has, therefore, waived them. *See* Hawai'i Rules of Appellate Procedure Rule 28(b)(7) ("Points not argued may be deemed waived.").

### IV.

FOFs 117 and 131 and COL 26 and any portion of the (1) May 21, 2002 "Order Regarding Plaintiff's Motion for Reconsideration Filed on February 22, 2002"; (2) July 25, 2002 "Order Denying Plaintiff's Second Motion for Reconsideration Filed May 31, 2002"; (3) August 6, 2002 "Decree of Absolute Divorce"; (4) December 20, 2004 "Order Upon Remand"; (5) March 8, 2005 "Order Denying Plaintiff's Motion for Reconsideration Filed December 30, 2004"; (6) June 15, 2005 "Findings of Fact and Conclusions of Law";

and (7) April 1, 2005 "First Amended Decree of Absolute Divorce" based on FOFs 117 and 131 and COL 26, including the family court's division and distribution of the Marital Partnership Property, are vacated, and this case is remanded for further proceedings consistent with this opinion.

Any portions of the above (1) "Order Regarding Plaintiff's Motion for Reconsideration Filed on February 22, 2002"; (2) "Order Denying Plaintiff's Second Motion for Reconsideration Filed May 31, 2002"; (3) "Decree of Absolute Divorce"; (4) "Order Upon Remand"; (5) "Order Denying Plaintiff's Motion for Reconsideration Filed December 30, 2004"; (6) "Findings of Fact and Conclusions of Law"; and (7) "First Amended Decree of Absolute Divorce" unrelated to FOFs 117 and 131 and COL 26 are affirmed and shall not be disturbed on remand.